MARIO REALI and MARIE REALI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; STANLEY FEINGOLD and DIANE FEINGOLD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reali v. Commissioner
Docket Nos. 19120-81, 21794-81.
United States Tax Court
T.C. Memo 1984-427; 1984 Tax Ct. Memo LEXIS 246; 48 T.C.M. (CCH) 826; T.C.M. (RIA) 84427; August 9, 1984. *246 R and F acquired certain rights to lithographs in 1977, for which they claimed investment credits under sections 38 and 48, I.R.C. 1954, for 1977, and depreciation deductions for 1977 and 1978. Held, since the lithograph activities of R and F were not engaged in for profit as required by section 183(a), I.R.C. 1954, and did not constitute a trade or business, nor were the lithographs held for the production of income, as required under section 167(a)(1) or (2), the claimed investment credits and depreciation deductions are disallowed. F and his spouse omitted from their 1977 and 1978 joint income tax returns interest income on bank accounts received by them in such years. Held, respondent correctly asserted the addition to tax for negligence for each such year under section 6653(a), I.R.C. 1954. Benjamin Lewis, for the petitioners. Victoria Wilson and Peter J. Devlin, for the respondent. NIMS
*249 MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Addition to Tax
Docket
Petitioner
Year
Deficiency
Section 6653(a) [1]
19120-81
Mario and
1977
$13,990.00
Marie Reali
1978
8,665.00
21794-81
Stanley and
1977
13,885.00
$694.00
Diane Feingold
1978
8,453.00
423.00
After concessions, the issues for decision are: (1) Whether petitioners' lithograph activities were engaged in for profit within the meaning of section 183; (2) Whether certain nonrecourse notes may be included in the basis of the property acquired by petitioners; (3) Whether the property acquired constitutes tangible personal property within the meaning of sections 38 and 48 for purposes of the investment credit; (4) Whether the property acquired has a determinable useful life; (5) Whether *250 the cost of the property acquired should be treated as an inventory cost; and (6) Whether the addition to tax under section 6653(a) for negligent disregard of rules and regulations was properly aserted against petitioners Feingold. Petitioners Reali concede that they are not entitled to any miscellaneous deductions (other than depreciation) claimed with respect to their lithograph activities for 1977 and 1978 in the amounts of $180.00 claimed for each year. Petitioners Feingold also concede that they are not entitled to miscellaneous deductions (other than depreciation) claimed with respect to their lithograph activities for 1977 and 1978 in the amounts of $260.00 and $190.00, respectively. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners Mario Reali (Reali) and Marie Reali, at the time of filing their petition in this case, resided at Lake Success, New York. Marie Reali is a party to these proceedings by reason of having filed joint returns with her husband. Petitioners Stanley Feingold (Feingold) and Diane Feingold, at the time of filing their petition in this *251 case, resided at Old Bethpage, New York. Diane Feingold is a party to these proceedings by reason of having filed joint returns with her husband, and also because of the failure to report on the 1977 joint return certain interest earned on a savings account owned by her. The term "petitioners" is hereinafter for convenience occasionally used to denote both Reali and Feingold, unless the context makes it clear that we are then referring to all four petitioners. Feingold is a physician, his specialty being orthopedic surgery. On Schedule C of his tax returns for the two years in question, Dr. Feingold referred to himself as an "art dealer." Reali is the owner of a private sanitation company, a trucking center, a real estate operation, a leasing company and a recycling center. On Schedule C of his tax returns for the two years in question he stated that he was in "lithograph sales." Neither Feingold or Reali had any expertiese in art or art prints prior to the years involved in this case, nor had either made any prior art investments. Both relied solely upon their accountant, Allan Kritzer (Kritzer), for investment advice regarding the lithographs in question. Aside from the *252 fact that they are petitioners in this consolidated case, Feingold and Reali have had no previous business or social connection with each other. During the years in question and some years before that, tax and accounting services were performed for both Reali and Feingold by Kritzer. In 1977, Kritzer was interested in obtaining tax shelters for his clients and through Jeffrey Klein, an employee of his, Kritzer came in contact with an artist named Dennis Oppenheim. Oppenheim, who was involved in other tax shelters at that time, referred Kritzer to Armand Drexler, a tax lawyer who was interested in putting together an art tax shelter involving Oppenheim's work. Drexler had become aware of the art tax shelter concept by reading a prospectus which "passed over his desk" in mid-1977. Sometime in 1977, Kritzer and Drexler contacted Ira Orshan, an insurance man also active in the promotion of tax shelters. Orshan expressed a willingness to develop a lithograph tax shelter, and he retained a law firm to provide the legal work for the proposed promotion. This included the preparation of a prospectus, a tax opinion and various other necessary documents, including forms for a nonrecourse *253 note, several recourse notes, purchase and sale and security agreements, a distribution agreement and an agreement with the artist, all of which were patterned after those in other art shelter prospectuses of which the lawyers were aware. In order to facilitate the promotion, Orshan organized an S corporation under the name Almond Art Sales, Ltd. (Almond Art), which issued an offering memorandum in December, 1977, entitled "An Offering of Lithographic Plates" (the Offering). In connection with the Offering, Oppenheim, the artist, was to create two portfolios, each consisting of 10 separate lithographs. Each lithograph was to be sold separately to a participant in the lithograph promotion. Pursuant to the Offering Reali acquired miscellaneous rights to a lithograph entitled "Ghost Trip", and Feingold acquired similar rights to a lithograph entitled "Land Cage/Wolf It Down." More specifically and pursuant to the Offering, Reali and Feingold each purchased a separate bundle of rights referred to as the "Property" in paragraph 2 of a standard Purchase and Sale Agreement utilized in the promotion. Paragraph 2 provides the following: 2. Purchase and Sale of the Property
Seller *254 hereby agrees to sell, assign and transfer to Purchaser, and Purchaser hereby agrees to purchase, and accept all right, title and interest in the Property throughout the world in perpetuity, including without limitation: (a) The Plate as set forth above. *
(b) The excelusive right to use, manufacture, sell, distribute, promote, advertise and license the Plate, the Prints therefrom, and the Images therein in any and all fields of use, whether now known or hereafter developed, for any and all purposes. (c) The exclusive right to copy, produce, reproduce and duplicate the Plate, the Prints therefrom, and the Images contained therein by any means and in any medium, whether now known or hereafter developed. (d) The exclusive right to use and control the use of the Plate, the Prints therefrom, and the Image contained therein. (e) All common law and statutory copyrights and rights to copyrights in the Plate and in the Image therein (filed under statute or otherwise) anywhere in the world and any extensions and renewals thereof, in the name and for the benefit of Purchaser (or its assignee or nominee). (f) The right to license and sub-license others to exercise all or any of the *255 foregoing rights. (g) Any and all other rights that normally accrue to ownership. The standard nonrecourse note utilized in the promotion provided that 50 percent of the proceeds from any net receipts realized from exploitation of the Property prior to the maturity of the note on December 31, 1987, were to be paid to the artist. The note accrued interest at the rate of six percent per annum which was payable at maturity, except that any prepayments were to be applied first against interest and any balance toward the reduction of principal. The note was secured solely by the Property. The offering memorandum provided that the following payments were to be made for the Property: Cash at closing on December 27, 1977
$ 8,000
Interest-free "Recourse Note",
payable July 1, 1978
5,000
Interest-free "Recourse Note",
payable July 1, 1979
4,000
"Non-transferable Nonrecourse Note",
payable to Oppenheim on
December 31, 1987
56,000
Total
$73,000
In the Purchase and Sale Agreement between Almond Art and Feingold and Reali, respectively, the Property is *256 defined as "the Plate, the Image, and the rights therein." The "Plate" in each case, although broadly described in the Purchase and Sale Agreement, actually consisted of five separate items, four of which were silkscreens and one of which was a metal lithograph plate. These materials were prepared from Oppenheim's original art work by photography. Silkscreen and offset lithography are processes common in commercial printing and the technologies are widely used. Both offset lithography and silkscreen printing are not necessarily expensive processes and are widely available in the United States. The lithographic print Land Cage/Wolf It Down measures 40 by 29 inches, and was printed by a combination of silkscreen and offest lithography on average grade paper. The print has been signed and numbered by the artist in an edition of 100. The print contains four elements: The upper part is a color aerial photograph of a landscape, on which the words "Wolf it Down" have been superimposed, which was reproduced by silkscreen. The lower left-hand corner, also silkscreen, is a 35 millimeter transparency of an extremely high altitude photograph of the site with a "Wolf it Down" earth alteration *257 superimposed. On the lower left, a black-and-white topographical photograph was printed by offset lithography. In the middle of the print, printed words describe the project. The lithographic print Ghost Trip was printed on a metal lithograph plate, prepared by a photosensitizing process used for lithographic printing. The upper part shows a photographic image of a landscape with the letters Ghost Trip on a hillside; the lower part, an aerial photograph from high altitude showing the proposed location. The Ghost Trip print was printed by lithography in four colors on a hand press, with a rubber stamp added. Ghost Trip measures 39-1/2 by 27 inches and was printed by offset lithography on average grade paper. It has been signed and numbered by the artist in an edition of 100. The use of a photo-reproductive technique involves copying a maquette rather than having the artist actually create an original object on a plate. A maquette is the prototype from which the print edition is produced. In Ghost Trip and Land Cage/Wolf It Down, Oppenheim created a collage of photographs on paper which served as the maquette for each print. When an artist creates a lithograph or etching by *258 working directly on the plate, he makes certain decisions that relate directly to the character of the material he is using. An important element is the level of artist involvement in the printing process. He must work with a printer and there is a certain collaborative synergism that occurs in successful print making. Such was not the case regarding Oppenheim's work vis-a-vis Land Cage/Wolf It Down and Ghost Trip. The metal lithographic plates in this case were made of aluminum. They were capable of producing at least several thousand prints before wearing out. In addition to the prints which Oppenheim was expected to number and sign, the metal lithographic plates could also have been used for making inexpensive poster editions. The metal plates could not, however, have been used for any other purpose such as, for example, printing T-shirts, bad sheets, napkins, postcards or similar items. All of these things would have required an interposition of another technology. For example, the image on the metal plate would have had to be reduced to a very small size in order to print cocktail napkins or postcards. The cost of preparing the Plates for Ghost Trip and Land Cage/Wolf *259 It Down was $1,750, respectively. Barbara Braathen was working part-time as Drexler's secretary in 1977 and 1978. Braathen acted as the "art consultant" to Drexler, Orshan and Kritzer. Braathen also acted as Oppenheim's agent. Braathen, as art consultant, obtained appraisals of the lithographs in connection with the Offering. The appraisals were provided by Anna Canepa, a video artist. Braathen also provided the biographical and promotional material on Oppenheim in connection with the Offering. Kritzer sold individually 19 of the 20 lithographs comprising the two portfolios to clients of his accounting firm, and he himself bought the 20th lithograph. Kritzer, however, paid only $5,000 in cash plus a $56,000 nonrecourse note. Kritzer also acted as agent for the investors, including Reali and Feingold, in the various lithographs in the two portfolios. He was paid $64,600 through a corporation named Gothic Sales, Inc., as commissions for selling the lithographs. Kritzer obtained the distributors for all of the investors, and he selected and secured the printers. He was also in charge of the subsequent distribution of the 20 prints. Two printers were used: THE SHOP in New *260 York City, which printed Ghost Trip; and Styria Studio, Inc., also located in New York City, which printed Land Cage/Wolf It Down. Braathen recommended Marian Goodman (doing business through Multiples, Inc.) as the best distributor for Oppenheim prints. Before selecting Goodman, Kritzer interviewed approximately 12 prospective distributors whose names he had secured from various sources. Kritzer ultimately selected Goodman because she had a good reputation as a distributor and had previously handled works by Oppenheim. The portfolio which Goodman was retained to handle included Land Cage/Wolf It Down. Although Kritzer ultimately followed Braathen's advice in retaining Goodman as distributor of some of the prints, her advice was fundamentally disregarded. Braathen was not consulted concerning any representations about the prints in the Offering Memorandum; and she was not consulted concerning the price to be paid to Oppenheim for the lithographs. At some point after Goodman was retained to serve as a distributor, she held a show at the gallery of Multiples, Inc. on East 57th Street in New York City in which was shown the portfolio which included Land Cage/Wolf It Down. No *261 Sales of any Oppenheim lithographs resulted from the show. Goodman later advised Kritzer that she was unhappy because others were also acting as distributors of Oppenheim's works. At that point, Kritzer hired Ann Ross to serve as distributor. Contrary to Braathen's advice, Edward Weston was hired as distributor of the 10 lithographs which included Ghost Trip. Before selecting Edward Weston to serve as distributor for the portfolio which included Ghost Trip, Kritzer also looked into a group of potential distributors. He chose Weston because his organization was a California distributor and also held exhibitions and shows in Europe where, Kritzer was advised, Oppenheim was popular. Weston, at the time of the distribution agreement, was experienced in distributing commercial art but had little or no experience in distributing fine art prints. He had no experience in distributing "earthwork" prints such as Ghost Trip. Weston received $3,500 for serving as distributor of the 10 prints. The distribution agreement between Weston and Reali provided for a sales commission of 35 percent and no provision for rimbursement of promotional expenses. The agreement contained no provision *262 for wholesale sales. Weston ran a single advertisement for the 10 prints, which appeared in a domestic magazine in January, 1981. Weston did not list the prints for sale on his price list until December, 1981. Distributors were not obtained for any of the print editions until October and November, 1978. Goodman, on behalf of Multiples, Inc., entered into a Distributors Agreement on Novement 13, 1978, with Feingold. Following the termination of Goodman's services in 1979, Ross was paid $500 per lithograph, or a total of $5,000, to distribute the portfolio which included Land Cage/Wolf It Down. By agreement dated September 10, 1979, Feingold engaged Ross to distribute the lithograph Land Cage/Wolf It Down. Feingold paid Ross $500 for these services. During 1979 and continuing to the time of the trial of this case, Ross operated her business out of her home and did not have a gallery for exhibition purposes. On October 29, 1979, Ross contacted Feingold to obtain prints of Land Cage/Wolf It Down. She did not receive the prints until January 13, 1980. Ross prepared a brochure captioned "Proposed Landscapes" in connection with the proposed distribution. She unsuccessfully *263 contacted corporations, museums, designer/decorators and miscellaneous galleries in attempting to sell the 10 lithographs under her supervision. She also took an ad in a publication called "Art In America" and showed all 10 of the lithographs at an exhibition called "Art Expo" held at the New York Coliseum. None of these efforts were successful in selling any of the Oppenheim lithographs. Conceptual art is an art form whose objective is the presentation of ideas rather than the creation of an art object. Earthwork artists are a group of conceptual artists who apply their ideas to the landscape. Oppenheim is a conceptual artist whose name is associated with the earthwork movement. The 20 lithographs making up the two portfolios in question, including Land Cage/Wolf It Down and Ghost Trip, are documentations of proposed earthwork projects. Oppenheim's earthworks are not concerned with aesthetics, but rather with conveying ideas. In the opinion of some art experts, the market, if any, for conceptual art has historically been extremely small because of its unaesthetic nature. Petitioners reported no income from the sale of lithographs on their 1977, 1978, 1979 and 1980 returns. *264 They claimed the following investment credits and depreciation deductions on their returns for said years: Investment
Year
Depreciation
Miscellaneous
Credit
Reali
1977
$12,625
$180
$7,300
1978
16,018
180
1979
13,554
190 1980
3,446
160
Totals
,45,643
$710
$7,300
Feingold
1977
$12,625
$260
$7,300
1978
16,482
190
1979
13,554
200
1980
3,446
150
Totals
$46,107
$800
$7,300
Petitioners Feingold failed to report the following interest income on their 1977 and 1978 returns: 1977
1978
The Lincoln Savings Bank (Diane)
$ 728.00
The Lincoln Savings Bank (Stanley)
235.00
Sunrise Federal Savings &
Loan Assoc. (Stanley)
943.00
$1,019.00
New England Mutual Life
Insurance Company (Stanley)
31.00
Melrose Credit Union (Stanley)
750.00
$1,937.00
$1,769.00
Petitioners Feingold were timely issued Form 1099 statements reflecting the above-mentioned interest income and there is no record that the Form 1099 statements were returned to the issuing institutions by the United States Postal Service, nor did the Feingolds change their address during the period relevant to the *265 issuance of the Forms 1099. OPINION In December, 1977, petitioners Reali and Feingold each purchased all the rights to lithographs (respectively, the Property) created by an artist named Dennis Oppenheim. The purchase price of the Property to each petitioner was $73,000, consisting of $17,000 in cash, payable in decreasing installments over three years, and a $56,000 nonrecourse promissory note. The acquired Property included a lithograph plate, the right to a signed limited edition of 100 prints to be made from the plate, the right to exploit the image for ancillary uses and the copyright to the image. The petitioners claim that they are entitled to (1) depreciation deductions for the years in question based based upon the $73,000 purchase price for the Property and (2) an investment credit for 1977 under section 48. Petitioners dod not contest respondent's disallowance of certain small amounts claimed by petitioners as miscellaneous expenses incurred in connection with their lithograph activities. Respondent contests petitioners' right to the claimed depreciation deductions and investment credit, asserting that petitioners' lithograph activities were not engaged in for *266 profit within the meaning of section 183; that the nonrecourse notes may not be included in the basis of the Property because the notes are too speculative or because the amount of the notes was excessive; that the Property does not constitute tangible personal property within the maning of sections 38 and 48 for purposes of the investment credit; and the Property has no determinable useful life; and that the cost of the Property should be treated as an inventory cost, thus rendering the Property not subject to depreciation allowances and not eligible for the investment credit. To a substantial extent, respondent's arguments track the positions taken by the Commissioner of Internal Revenue in Rev. Rul. 79-432, 1979-2 C.B. 289, in which he disallowed depreciation deductions and the investment credit in connection with lithograph activities. In the case of the Feingolds, respondent has also asserted the addition to tax under section 6653(a) for negligent disregard of rules and regulations, since the Feingolds failed to report certain interest income received by them in 1977 and 1978. *267 To qualify for an investment credit a taxpayer must, among other things, make a qualified investment in so-called "section 38 property." The characteristics of section 38 property relevant to petitioners' entitlement to a credit are that the section 38 property must be (1) tangible personal property, (2) with respect to which depreciation is allowable, (3) which has a useful life of three years or more and (4) which is not used predominantly outside the United States. Section 48; see Hanna Barbera Productions, Inc. v. United States, an unreported case (C.D. Cal. 1977), 77-1 USTC par. 9365, 39 AFTR 2d 77-1169. The section 38 property must be placed in service in the year for which the credit is claimed. Section 46(c). Petitioners take the position that the Property qualified for the investment credit under the theory that the lithograph plates are similar in nature to motion picture film master negatives and seismic data tapes, in that the plates, like the analogized negatives and tapes, are tangible property whose value has been substantially enhanced by intangible input. Some of the cases upon which petitioners rely are Walt Disney Productions v. United States,549 F.2d 576 (9th Cir. 1976) *268 (motion picture master negatives held to be "tangible property" within the definition contained in section 48(a)(1)) and Texas Instruments Inc. v. United States,551 F.2d 599 (5th Cir. 1977) (seismic data tapes held to be tangible property). We are unaware of any cases in which this Court has considered the issue raised by facts similar to those in Walt Disney Productions and Texas Instruments, and even if such were the case we would question whether, on the basis of the record before us, petitioners' analogy is apt. We need not grapple with the rather metaphysical questions posed by the cases cited by petitioners and their application to the facts before us, however, since in our view petitioners have overshelmingly failed to establish that the transactions in question constitute "an activity engaged in * * * for profit" within the ambit of section 183(a). [2]
*269 In broad terms, section 183 imposes limitations on deductions attributable to an "activity not engaged in for profit." See section 183(b); Lemmen v. Commissioner,77 T.C. 1326, 1339-1340 (1981). As defined in section 183(c), the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable under section 162, relating to expenses paid or incurred in carrying on a "trade or business," or under paragraph (1) or (2) of section 212, relating to expenses paid or incurred for the production of income or for the management, maintenance or conservation of "property held for the production of income." Lemmen v. Commissioner,supra at 1340. As provided in section 1.183-1(a), Income Tax Regs., "[w]hether an activity is engaged in for profit is determined under section 162 and section 212(1) and (2) except insofar as section 183(d) creates a presumption [not here applicable] that the activity is engaged in for profit." *270 Section 167(a) allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business" or "property held for the production of income." Section 48(a)(1) defines property with respect to which an investment credit is allowable under section 38 to include "other property with respect to which depreciation (or amortization in lieu of depreciation) is allowable." The "trade or business" and "production of income" requirements under section 167 are the same as those under sections 162 and 212. Lemmen v. Commissioner,supra at 1340. It is thus obvious that without a finding that the scrutinized activity constituted a trade or business, or that the relevant expenses were for the production of income, no depreciation deductions and hence no investment credit are allowable. As we held in Lemmen,deductions are allowable under sections 162, 212(1) or (2), and by implication, at least, 167(a), where a taxpayer, irrespective of whether others might view his expectations as reasonable, is engaged in an activity *271 with the objective of making a profit. To fall outside section 183, petitioners in the instant case must establish that they engaged in their lithograph activities with an actual and honest profit objective. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir., April 5, 1984), affd. by order (2d Cir., January 23, 1984), affd. sub nom. Krasta v. Commissioner, in an unpublished order, 734 F.2d (3d Cir. 1984), affd. sub nom. Hook v. Commissioner, in an unpublished order 734 F.2d 5 (3d Cir. 1984); Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. by unpublihed opinion (D.C. Cir., February 22, 1983). We think petitioners have failed to demonstrate any profit motive so as to qualify the Property for the claimed investment credit and depreciation deductions. Furthermore, we think the evidence taken as a whole requires a finding, as respondent argues, that petitioners purchased the Property solely to gain the tax advantages which, they hoped, would inure from the transactions undertaken. *272 Treasury Regulation section 1.183-2(b) lists some relevant factors to be taken into consideration in determining profit motive. These are: (1) The manner in which the taxpayer carries on the activity. (2) The expertise of the taxpayer or his advisors. (3) The time and effort expended by the taxpayer in carrying on the activity. (4) The expectation that assets used in activity may appreciate in value. (5) The success of the taxpayer in carrying on other similar or dissimilar activities. (6) The taxpayer's history of income or losses with respect to the activity. (7) The amount of occasional profits, if any, which are earned. (8) The financial status of the taxpayer. (9) Elements of personal pleasure or recreation. The regulation also provides, among other things, that other factors in addition to the listed factors are to be taken into account in making the profit motive determination, and that a determination is not to be made merely on the basis that the number of factors indicating a lack of profit motive exceeds the number of factors indicating a profit motive, or vice versa. Section 1.183-2(b), Income Tax Regs. *273 In the discussion which follows, we deal only with those factors and other considerations which we deem germane to our present inquiry. In considering the manner in which a taxpayer carries on the activity, it is necessary to examine the actions and intentions of the individuals who actually controlled the activity, where, as here, the individual taxpayers are "virtually passive" with respect to the operation of the activity. Fox,supra at 1008; Flowers v. Commissioner,80 T.C. 914, 932 (1983). In the case before us, the parties stipulated that Reali and Feingold relied solely on the advice and recommendations of their accountant, Allan Kritzer. Other than signing the documents presented to them by Kritzer necessary to complete the Purchase and Sale and the distribution agreements, Reali and Feingold took no action to keep themselves advised of Kritzer's activities. After Reali and Feingold had purchased the Property, they relied entirely on Kritzer to arrange the printing of the limited editions and to obtain distributors for the prints. Thus, in order properly to analyze the motives of Reali and Feingold in their respective Schedule C activities, it *274 is necessary to examine the actions of both the persons in control of the lithograph promotion and the individual petitioners, Reali and Feingold. Reali and Feingold bought, respectively, two of the 20 lithograph print "packages" (which we have previously referred to as the Property) which were sold by Kritzer in the lithograph shelter promoted by Ira D. Orshan through a Subchapter S corporation, Almond Art Sales, Ltd., formed solely for this purpose. Orshan's principal occupation was that of insurance and tax shelter salesman. Nothing in the record reveals any other connection on his part with the art world. Kritzer, an accountant whose clientele of 20 years standing included Reali and Feingold, was interested in obtaining tax shelters for his clients and, through an employee of his, Jeffrey Klein, came in contact with the artist, Dennis Oppenheim. Oppenheim, in turn, referred Kritzer to Armand Drexler, a tax lawyer also interested in putting together an art tax shelter. Drexler's part-time secretary, Barbara Braathen, testified at the trial of this case, in part as follows: A. I became involved with the tax shelter, art tax shelters, when the idea passed over Armand Drexler's *275 desk in mid-'77 and he said "This looks like a fun idea for us to pursue and let's see what we can do." Q. What do you mean "the idea passed over" his desk? A. I think a prospectus, an art tax shelter prospectus and he said "What a novel idea." Kritzer, Drexler and Braathen contacted Orshan and asked him to put the art tax shelter package together. Orshan, in turn, retained a law firm to provide a tax opinion and other legal work for the promotion. The forms for the various documents included in the package were patterned after those in other art shelter prospectuses. Oppenheim, the artist chosen to do the art work, produced other print editions in 1977 and 1978 for tax shelter entities, including Jackie Fine Arts. Further evidence that everyone in the promotion was interested primarily in selling tax shelters rather than commercially exploiting the lithographs is contained in papers and correspondence among the various individuals involved. For example, Orshan signed an agreement with klein in which the lithographs are referred to as "art tax shelters." Klein, incidentally, was Oppenheim's tax accountant. The attorney who prepared the various documents signed a letter *276 regarding his drafting of the documents connected, in his words, with the "art tax shelter program." Marian Goodman, one of the distributors of the prints ultimately retained by Kritzer, refers to the "other tax shelter contract that I mentioned to you" in a letter to Kritzer dated April 10, 1978. Braathen, the "art consultant" retained by Kritzer refers both in her testimony and in correspondence to the promotion as a "tax shelter." Each purchaser was provided with an appraisal addressed to Almond Art by Anna Canepa, a self-Styled "video artist." The appraisal for each of the 20 prints in the overall promotion was identical except where the name of the individual print was inserted. The record does not indicate that either Reali or Feingold saw the actual lithograph he was purchasing prior to signing the Purchase and Sale Agreement, although Reali testified that he "may have". Reali and Feingold evidenced no interest whatsoever in selling the limited editions which they purchased. They, themselves, having no experience or expertise in marketing art or art prints, relied solely on the advice of Kritzer, who himself had no expertise in selling art prints. Petitioners admitted *277 to discussing the tax consequences of the venture with Kritzer, but they received no profit projections from the commercial exploitation of the lithographs. As of the date of signing the Purchase and Sale Agreement, December 28, 1977, no arrangements had been made for distribution of the prints and the Purchase and Sale Agreement provided that each investor was responsible for the distribution of his own print. As a matter of fact, the distributors for the prints were not retained until almost a full year had passed after the 1977 closing of the Purchase and Sale Agreement, although the investment credit and a substantial depreciation deduction was claimed by each set of petitioners on their 1977 returns. It is true that one of the distributors ultimately retained, Marian Goodman, appears to have had previous experience in marketing Oppenheim's work, and also appears to have made some sort of good faith, though limited, effort to sell the 10 lithographs assigned to her. The record does not indicate what, if any, compensation Ms. Goodman received for her efforts. Nevertheless, she eventually became disillusioned with the half-hearted arrangements made by Kritzer on petitioners' *278 behalf, and resigned the assignment. Goodman's successor, Ann Ross, was paid $500 by Feingold to act as distributor, but she lacked a gallery or other facilities for making any serious effort to exploit the lithograph and was unsuccessful in doing so. Edward Weston entered into an agreement with Reali wherein he undertook to market Ghost Trip for a 35 percent commission. As to selling price, the agreement provided only that any proposed sale of a lithograph for less than $400 required Reali's prior approval. Weston placed an advertisement for the 10 lithographs assigned to him, including Ghost Trip, in a publication called "Art Magazine" which appeared in January, 1981. Weston also listed Ghost Trip in his December, 1981, price list. Insofar as the record reveals, these are the only two actions taken by Weston to sell Ghost Trip, and both of these actions occurred after the income tax audit of the Reali's 1977 and 1978 returns had commenced. Both selling efforts were completely unsuccessful. In short, the record makes it abundantly clear that the entire focus of the transaction up to the time the Purchase and Sale Agreement was entered into by Reali and Feingold, respectively, *279 was on creating and obtaining a tax shelter, and not upon any profit to be derived from promotion of the lithographs acquired. An important factor in determining the profit motive of an individual is his own expertise or that of his or her advisors. Section 1.183-(2)(b)(2), Income Tax Regs.; Fox v. Commissioner,supra at 1008. Most of the individuals involved in the promotion, namely Kritzer, Klein, Drexler, Orshan and the attorneys retained by Orshan had expertise in law, accounting and tax shelter promotions, but no expertise in art or art prints. Braathen, Drexler's part-time secretary, was hired as the "art consultant" for the project and the promoters relied upon her for biographical and promotional material on Oppenheim.Braathen, however, whatever her expertise or lack thereof might have been, had no control over the promotion and her advice was disregarded by the other principals. Braathen also located the appraiser, Canepa, and the printers. She represented Oppenheim and served as well as art consultant to the project. However, she had nothing to do with determining the prices which the individual purchasers were to pay for their prints. Feingold *280 is an orthopedic surgeon. Reali is the owner of a private sanitation company, a trucking center, a real estate operation, a leasing company and a recycling center. It was stipulated that neither Reali or Feingold had any expertise in the field of art or art prints, and that neither had made any investments in art or art prints prior or subsequent to the ones at issue here. An additional factor which we consider to be central to a detrmination of profit motive is the relationship of the purchase price to the expected profit from the activity. The record is devoid of any evidence whatsoever indicating that the purchase price for the Property paid by Reali and Feingold, respectively, to Almond Art was in any way determined with a "true regard for the profitability of the activity." Brannen v. Commissioner,78 T.C. 471, 509 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The entire deficiency in the Reali's case, and all of the deficiency except the part related to omitted interest income in the Feingold's case, represents the tax savings expected to be realized *281 by petitioners from their lithograph activities. Thus, the Realis expected to save $22,655 in income taxes for 1977 and 1978, plus additional amounts in subsequent years, for a cash outlay of $8,000 at the end of 1977, $5,000 in July, 1978, and $4,000 in July, 1979, a total of $17,000. The Feingolds expected to save approximately $20,667 [3] in 1977 and 1978 taxes, plus additional amounts in later years, for the identical $17,000 total outlay in 1977 to 1979. Payment of the $56,000 nonrecourse notes which Reali and Feingold assumed was, of course, entirely contingent upon sales of the lithographs. Consequently, there was no compelling reason why petitioners should have made any serious effort to exploit the Property which they acquired, and the record overwhelmingly confirms the fact that they did not. *282 The $73,000 purchase price per lithograph package bore no relationship whatsoever to any profit potential from the sale of lithographs. Goodman had listed Oppenheim's prior works for sale at $300, and Weston was authorized to sell Ghost Trip for $400 without prior consent of Reali. Weston was entitled to receive a 35 percent sales commission from any sale and presumably Goodman likewise would have been compensated for any sales she might have made. Thus, if Weston had sold a copy of Ghost Trip (which he never did at any price) for $400, from which he would have been entitled to retain $140, Reali would have received net proceeds of $260. From this amount, Reali would have been required to pay Oppenheim $130 under the provisions of the nonrecourse note. At this rate, Weston would have had to sell at least 560 prints at $400 per print for Reali to break even. Since the Purchase and Sale Agreement provided that Oppenheim would sign only a limited edition of 100 prints, the 100 signed prints would have had to have been sold for substantially more than $400, or a substantial sale of unsigned prints, i.e., posters, would have had to have been made. In actuality, there was never any *283 prospect for either of these eventualities. We might further observe that the nonrecourse note provision requiring payment to Oppenheim of 50 percent of any net receipts from exploitation of the Property had the practical effect of negating any potential loss of tax deductions to petitioners, since the note also provided that any such payments would first be applied against accrued interest. Since the $56,000 note accrued interest at the rate of 6 percent, or $3,360, per annum, the likelihood of any non-deductible principal payments being made was infinitesimal. See discussion in Barnard v. Commissioner,731 F.2d 230 at 231-232, (4th Cir., April 5, 1984), affg. 80 T.C. 972 (1983). There is no direct evidence in the record as to any sales of Oppenheim's work prior to the years before the Court (nor were there any during such years or thereafter). However, respondent's expert witness, Richard H. Solomon, based his appraisal in part on an assumed sale over five years (1973-1978) of most of an edition of 81 portfolios of 10 images each of Oppenheim's prints, at $800 per portfolio. Unlike the lithographs which petitioners bought (which Solomon considered *284 to be of marginal quality), the 810 images in the 81 portfolios were considered by Solomon to be of very high quality which "got excellent distribution in the United States and Europe." Assuming the 81 portfolios were all sold at the $800 per portfolio catalogue price (there is, in fact, no evidence that they were), the total sales of all previous Oppenheim earthwork prints would have totalled only $64,800. The facts as to these prior high-quality Oppenheim prints were or could have been available to petitioners and the promoters as of December, 1977, when Reali and Feingold entered into the transactions in question, yet we are now asked to accept at face value each petitioners' purchase of a single, marginal lithograph for the purported price of $73,000. This we are unable and unwilling to do. Solomon is a highly qualified print collector and dealer and we find his testimony wholly credible. He concluded his expert reports on Ghost Trip and Land Cage/Wolf It Down with the conclusion that "the assets acquired [by Reali and Feingold] had no economic viability in 1977." Based upon Solomon's appraisal as well as our own independent analysis of the facts in the record before us, *285 we accept Solomon's conclusion as correct. [4]
Viewing objectively all of the evidence in this case, we can only conclude, and we hold, that under section 183 petitioners were not engaged in an activity for profit with regard to the lithograph activities. Therefore, since petitioners' lithograph activities were not engaged in for profit, petitioners are not entitled to depreciation deductions under section 167 or investment credits under section 48. Respondent asserted the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a) as to petitioners Feingold for 1977 and 1978 in connection with their failure to report substantial amounts of interest income for those years. Feingold's only explanation for this failure was that he turned over whatever 1099 forms he received from various financial institutions to Kritzer, who prepared the tax *286 returns. A minimum effort on the Feingold's part and a cursory examination by them of their tax returns would have alerted them to the fact that interest on five substantial bank accounts was not being reported. The burden of proof is on petitioners Feingold to prove that the addition to their 1977 and 1978 income tax is erroneous. Otis v. Commissioner,73 T.C. 671 (1980); Rule 142(a). This burden has not been met, and respondent's determination on this issue is sustained. To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue unless otherwise indicated. All references to rules are to the Tax Court Rules of Practice and Procedure, except as noted.↩
*. The artist will sign and number 100 Limited Editions when the Purchaser causes same to be printed.↩
2. Sec. 183 reads, in relevant part, as follows: (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. (d) PRESUMPTION.--If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.↩
3. The Feingolds' asserted deficiency related to their lithograph activities is computed as follows: 1977
1978
Total adjustment to income
$14,822.00
$18,441.00
Lithograph deductions
12,885.00
16,672.00
Lithograph deductions as a percent
of total adjustment
.869316
.9040725
Deficiency
$13,885.00
$ 8,453.00
Less: investment credit
7,300.00
Balance of deficiency
6,585.00
8,453.00
Times
.869316
.9040725
5,724.45
7,642.13
Investment Credit
7,300.00
Lithograph deficiency
$13,024.45
$7,642.13
Total lithograph deficiency for 1977 and 1978 ($13,024.45 plus $7,642.13): $20,667.↩
4. Solomon testified that when he went to examine Ghost Trip, he discovered that Reali had stored the plate and the prints, property for which he had ostensibly paid $73,000, in a dirty basement of a dilapidated house--hardly conditions under which paper or something of value should be stored.↩