JOSEPH F. MOORE, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 16743–83.     Filed July 25, 1985.

*Philip R. Linsley, Joseph F. Moore,* pro se, and *John E. Crooks,* for the petitioner.

*John O. Kent* and *Gregory A. Roth,* for the respondent.

RAUM, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income taxes for 1979 and 1980 in the amounts of $11,845 and $7,618, respectively. The principal substantive issue for decision is whether the Commissioner erred in disallowing losses with respect to petitioner's purported activity as an "exclusive territorial distributor" of gemstones.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioner was a resident of Glendale, California, when he filed his petition herein.

Petitioner is an attorney, licensed to practice law in the State of California. He is experienced in Federal tax law. He has appeared as counsel in this Court in tax shelter litigation, and he has qualified and testified as an expert witness in at least one criminal tax matter involving a tax shelter promoter.

The losses in issue herein arose out of petitioner's involvement in a tax shelter based upon a gemstone distributorship program (program) organized by Joseph R. Laird (Laird) and John Crooks (Crooks). Laird and Crooks are California attorneys who have organized and promoted tax shelters. Laird, the "mastermind" of the gemstone program herein, has promoted shelters involving real estate, coal, master recordings, motion pictures, and gemstones. He is cited as the "promoter" in *Beck v. Commissioner*, 74 T.C. 1534, 1536, (1980), affd. 678 F. 2d 818 (9th Cir. 1982). See also *Oneal v. Commissioner*, 84 TC. 1235, 1242 n. 10 (1985). Petitioner worked an an "associate" in Laird's law firm from the summer of 1976 until around September 1979, when he became associated with the law firm which "represented" Laird. Crooks is petitioner's "friend * * * and an associate * * * in certain matters," and is one of the attorneys of record in this case.

Another person who played a prominent part in the organization and operation of the gemstone tax shelter herein is Frank Davis (Davis), a resident of Utah. He was in the jewelry business and was experienced in or familiar with the mining, cutting, importing, purchasing, selling, and mounting of diamonds and other precious gems. Davis became interested in

the jewelry business sometime in the late 1960's, and, in 1969, he was employed in a "supervisory capacity" in a Brazilian diamond mining operation. Upon returning from Brazil, he enrolled in courses offered by the Gemological Institute of America, and earned a certificate in diamond grading and evaluation. Sometime during the mid-1970's he was engaged as a "manager" for Kimberly Distributors, a wholesale, manufacturing diamond distributorship, where a person named Larry Rutherford (Rutherford) worked for him as a salesman.

Sometime in 1976 or 1977, Davis and Rutherford decided to leave Kimberly Distributors and start their own diamond wholesale operation. Thereafter, Davis, his wife, and Rutherford incorporated DWR, INC., (DWR) to engage mainly in the wholesaling of diamonds to the jewelry trade. Originally, Davis and his wife owned all of the stock of DWR, but Rutherford eventually exercised an option and became a minority shareholder of the company.

DWR's business flourished. Initially, it sold its products to "jewelry stores, * * * wholesalers and dealers." Then, in 1977 or 1978, as the demand for investment grade diamonds, the highest quality diamonds, expanded, DWR started to sell to firms which were interested in diamonds mainly as an investment, rather than simply as jewelry. Davis estimated that by early 1979, DWR's gross sales had reached "a couple of million dollars" and that he, and thus DWR, had "access" to over $10 million worth of gemstones, primarily from the inventory of other suppliers, principally in New York, including some of the suppliers who enjoyed the privilege of buying diamonds directly from the DeBeers diamond cartel ("sight" buyers).

DWR was well-positioned to take advantage of the growing demand for investment grade diamonds. Although Davis resided in Utah and carried on DWR's business from a base in that State, he had private line connections with important sources in New York. He had well developed "loyalties" within the trade, and, because he was interested in buying for DWR all types of diamonds, not just the investment grade type, he had a favorable position with suppliers who were then besieged with investors searching for only high quality diamonds.

Rutherford's work for DWR was largely that of a salesman. In June 1979, he attended the first annual Precious Gems

International Conference, a conference for those "interested in tangible assets as a medium of investment." There he met Laird and Crooks, who presented him with "a concept and a business approach * * * [for] creating [a] market for distributing diamonds and gemstones." This "concept and * * * approach" basically involved DWR's selling the right to distribute its product to "people interested in the diamond and precious stone world" who would then sell the product on a consignment basis through retail jewelry stores.

Rutherford reported Laird's and Crooks' distributorship proposal to Davis, who thereafter met with Laird and Crooks to discuss the idea more fully, and who found the proposal acceptable.

Soon after Laird, Crooks, Davis, and Rutherford discussed the distributorship proposal, they formed three entities: American Gold & Diamond Corp. (American Gold), United States Distributor, Inc. (U.S. Distributor), and Gem-Mart Consultants, Inc. (Gem-Mart). American Gold, a Utah corporation, initially owned equally by Davis and Rutherford, was to supply gemstones to the program at a price which would purportedly allow the distributors to earn a profit on the product's resale. Like DWR, American Gold was to be an entity through which Davis could buy and sell gemstones. DWR was not availed of to supply products to the program since Davis was yet unwilling to "blend" DWR's reputation with the program. Davis had no legal obligation to supply gemstones to American Gold or to distribute them through it.

U.S. Distributor, a Nevada corporation, initially owned by Crooks and Laird, was to market the distributorship program. American Gold granted it the exclusive "right" to distribute American Gold's "product" worldwide for a period of 50 years, beginning with July 1, 1979. U.S. Distributor paid American Gold nothing for this right. U.S. Distributor was then to sell the right to distribute American Gold's "product" within certain specific geographic areas defined by zip code ("distributorships") to investors ("territorial distributors") like petitioner, who, as will appear hereinafter, "purchased" one of the distributorships. The distributorships were marketed by U.S. Distributor through a team of salesmen experienced in financial matters but in general unfamiliar with precious gems or the jewelry business. In marketing the distributorships, em-

phasis was placed upon tax savings. The distributorships were sold to persons who were inexperienced in the jewelry business. The minimum price for a distributorship was $240,000, and increased substantially depending primarily upon the amount of tax savings sought by the purchaser. The price of the distributorship purchased by petitioner, hereinafter more fully described, was $384,000. The goal of the program was to sell about 5,000 distributorships, but ultimately only some 1,000 were sold.

Gem-Mart, a wholly owned subsidiary of American Gold, was to take advantage of Davis' sales ability and theoretically to assist the territorial distributors in selling the product to jewelry stores. It was to act as the "sales arm" for the territorial distributors.

Soon after the above-described entities were created, Laird and Crooks purchased Rutherford's interest in American Gold. Thereafter, Davis traded one-half of his interest in American Gold for a one-quarter interest in U.S. Distributor. Also, at some unspecified time, Crooks, or a member of his family, purchased Laird's interest in American Gold and U.S. Distributor. Upon the conclusion of these transfers, Davis emerged as the owner of one-fourth of the stock of American Gold and U.S. Distributor, and Crooks (together with his family) owned three-fourths of the stock of each of these corporations.

Sometime in late 1979, Crooks requested petitioner to examine a draft tax opinion letter concerning the tax shelter program involved herein and asked whether he would assist in the program's tax defense. After reviewing the letter, petitioner not only agreed to aid in the tax defense, but also decided to acquire a distributorship for himself.

The operative document reflecting the purchase and sale of a territorial distributorship is contained in a pamphlet captioned "Contract Documents." The pamphlet contains a "Tax Opinion Letter," the "Territorial Distributorship Agreement," and "Exhibits." Each pamphlet bears a serial number, and U.S. Distributor is identified at the lower half of the front cover with an address in Carson City, Nevada. There were at least two copies of the pamphlet in respect of each purchase and sale, one containing the executed Territorial Distributorship Agreement retained by the purchaser, and the other containing the duplicate original executed Territorial Distri-

butorship Agreement to be kept by U.S. Distributor.[1] The pamphlet containing petitioner's retained duplicate original was introduced in evidence. American Gold was also a party to the Territorial Distributorship Agreement and is referred to therein as "Importer," and U.S. Distributor is referred to as "Distributor." The Territorial Distributorship Agreement (referred to hereinafter sometimes merely as the agreement) provides in principal part as follows:

### TERRITORIAL DISTRIBUTORSHIP AGREEMENT

The undersigned represent and agree as follows:

\*       \*       \*       \*       \*       \*       \*

3. PRODUCT of IMPORTER includes the following:

*Product A* includes a combination of (1) a Diamond; (2) A quality Analysis Certificate from [a] * * * recognized independent gemological laboratory * * * [and] (3) One Certificate from an independent gemological laboratory or an independent appraiser which verifies that the Diamond matches the contents of the Quality Analysis Certificate with a statement of its Estimated Market Retail Price.

*Product B* includes a combination of (1) an investment grade quality Ruby, or an investment grade quality Sapphire, or an investment grade quality Emerald; (2) a Quality Analysis Certificate from [a] * * * recognized independent gemological laboratory * * * [and] (3) One Certificate from an independent gemological laboratory or an independent appraiser which verifies that the gem matches the contents of the Quality Analysis Certificate with a statement of its Estimated Market Retail Price.

*Product C* includes a combination of (1) a Precious gem imported from Brazil; [and] (2) a statement from an independent appraiser of its Estimated Market Retail Price.

A Precious Gem imported from Brazil is defined as one of the following Gems: Aquamarine, Amethyst, Citrine, Garnet, Kunzite, Opal, Precious Tourmaline, Rubellite, and Precious Topaz.

*Product D* includes a combination of (1) a Precious Gem originating in Australia, India, Africa, Thailand, Burma or Sri Lanka (formally [sic] Ceylon), and other areas; [and] (2) a statement from an independent gemological laboratory or an independent appraiser of its Estimated Market Retail Price.

A Precious Gem originating in Australia, India, Africa, Thailand, Burma or Sri Lanka (formally [sic] Ceylon) is defined as one of the following: Amethyst, Aquamarine, Citrine, Emerald, Garnet, including Green Garnet, Opal, Precious Tourmaline, Ruby, Sapphire, and Tanzanite.

---

[1]Certain "Instructions" at the bottom of Exhibit G to the agreement, *infra*, p. 86, would appear to indicate that there was still a third copy that was to be sent to an escrow company in Carson City, Nevada.

*Product E* - Fine Jewelry.

*Product F* - Costume Jewelry.

*Product G* - Such exclusive rights to purchase Precious Gems and commercial and industrial gem materials as IMPORTER may acquire, on a prorated basis with all other TERRITORIAL DISTRIBUTORS during the term of any TERRITORIAL DISTRIBUTORSHIP. * * *

4. IMPORTER has delegated to DISTRIBUTOR the exclusive right to distribute worldwide one hundred (100%) percent of its PRODUCT as is described in Paragraph 3 hereof for a period of fifty years beginning with July 1, 1979.

5. DISTRIBUTOR will not compete with any TERRITORIAL DISTRIBUTOR and agrees that all of the PRODUCT to which it is entitled pursuant to Paragraph 4 will be made available exclusively to TERRITORIAL DISTRIBUTORS.

6. DISTRIBUTOR hereby transfers to TERRITORIAL DISTRIBUTOR an exclusive TERRITORIAL DISTRIBUTORSHIP permitting TERRITORIAL DISTRIBUTOR to engage in the business activity as set forth herein within the Specified Territory, including the right to distribute the PRODUCT to retail and wholesale outlets within the Specified Territory.

7. TERRITORIAL DISTRIBUTOR is entitled, along with all other TERRITORIAL DISTRIBUTORS within the United States, to purchase the entire supply of the PRODUCT of IMPORTER on a pro rata basis with all other TERRITORIAL DISTRIBUTORS.

8. IMPORTER has an arrangement to acquire Diamonds purchased by several "sight buyers" from the Central Selling Organization and from other primary sources. * * *

9. IMPORTER has relationships with major volume-suppliers of Colored Precious Gems and these relationships will form a basis for sales by IMPORTER to TERRITORIAL DISTRIBUTORS at favorable prices.

10. IMPORTER has relationships with suppliers of Costume Jewelry, and these relationships will form a basis for sales by IMPORTER to TERRITORIAL DISTRIBUTORS at favorable prices.

11. IMPORTER is a manufacturer of fine jewelry.

12. IMPORTER is continuously advised by individuals who are highly skilled and pre-eminent in their fields of the economics of the gem industry, the political considerations affecting the gem industry, purchasing of gems, fair standards of sales, gemological analysis and quality grading of gems, and appraisal of Diamonds and other Precious Gems. * * *

13. WARRANTIES

\* \* \* \* \* \* \*

B. DISTRIBUTOR warrants that:

In the event TERRITORIAL DISTRIBUTOR adopts the accrual method of accounting for the business covered by this TERRITORIAL DISTRIBUTOR-SHIP AGREEMENT, DISTRIBUTOR will supply at its expense a defense of the tax treatment of TERRITORIAL DISTRIBUTOR projected in the Tax Opinion Letter. Such support will include representation at the Internal Revenue Service level upon the issuance of a 30-day letter from the Internal

Revenue Service (IRS Form 950(DO) or its equivalent), and defense in the United States Tax Court and the United States Court of Appeals.

*    *    *    *    *    *    *

As a foundation for said warranties, a Trust has been established wherein the Trustee holds real property consisting of 2,000 acres of land appraised at $8,000,000 which is encumbered in the approximate amount of $3,000,000. Trustor has transferred to Trustee the power to obtain the reconveyance of approximately 150 acres of said land from the effect of any encumbrance thereon, and Trustee shall cause to be released said 150 acres of said land from the effect of any encumbrance and thereafter shall hold said land free and clear of any encumbrance until it is sold pursuant to the terms of said Trust. Said 150 acres to be so released and so held have been appraised at $4,000 per acre. All of this property is residential and/or commercial. The Trustee has been instructed to sell or exchange any amount of said real property in order to pay TERRITORIAL DISTRIBUTORS any damages they may suffer as the result of the breach of the warranty expressed in Paragraphs 13 A and B.

Trustee has been instructed to continue with planning and engineering of said real property to enable the Trustee to subdivide and sell parcels thereof.

Trustee has been instructed to invest the surplus cash from such sales in Diamonds and Precious Gems and to hold, sell, and reinvest in Diamonds and other Precious Gems in order to maintain a fund in the form of Diamonds and Precious Gems of at least $1,000,000 in Market Value.

The Trustee shall release the real property remaining in the Trust when Trustee holds an inventory of at least $1,000,000 in Market Value of Diamonds and other Precious Gems as defined in this Agreement.

Said inventory of Diamonds and Precious Gems shall be held and managed by Trustee by selling and reinvesting in Diamonds and other Precious Gems during the existence of this Agreement.

14. The PRODUCT will be provided to TERRITORIAL DISTRIBUTOR at a price as follows:

*Product A* - Either approximately one hundred ten (110%) percent of the average price charged by major diamond cutters on 47th Street in New York City * * * or, at the option of IMPORTER, forty (40%) percent of the stated Estimated Market Retail Price as of the date of the statement.

*Product B* - From thirty-five (35%) percent to forty (40%) percent of the stated Estimated Market Retail Price provided by an independent gemological laboratory or an independent appraiser.

*Product C* - From twenty (20%) to thirty (30%) percent of the stated Estimated Market Retail Price provided by an independent gemological laboratory or an independent appraiser.

*Product D* - From twenty (20%) percent to thirty (30%) percent of the stated Estimated Market Retail Price provided by an independent gemological laboratory or an independent appraiser.

*Product E* - From thirty-five (35%) percent to forty (40%) percent of the suggested retail price.

*Product F* - Twenty (20%) percent of Suggested Market Retail Price.

*Product G* - A price which does not exceed IMPORTER'S cost plus fifteen (15%) percent.

15. The full purchase price provided in Paragraph 14 for PRODUCT must be deposited with IMPORTER at the time of the order.

16. TERRITORIAL DISTRIBUTOR agrees to make prepayments to DISTRIBUTOR on all Principal Sum Annual Installment Promissory Notes delivered from TERRITORIAL DISTRIBUTOR to DISTRIBUTOR pursuant to this TERRITORIAL DISTRIBUTORSHIP AGREEMENT. Said prepayments will be in the amount of ten (10%) percent of the total cost of TERRITORIAL DISTRIBUTOR for all PRODUCT purchased from IMPORTER pursuant to Paragraph 14.

A TERRITORIAL DISTRIBUTOR will be instructed by DISTRIBUTOR as to the method of payment to be utilized with reference to this prepayment requirement. All prepayments received will be applied to Promissory Notes, whether Recourse or Non-Recourse in chronological order. This prepayment requirement will terminate on December 31, 2004.

  &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

19. This Agreement has employed the term "Estimated Market Retail Price." Depending upon the appraiser involved, similar terms may be substituted, including: (1) Estimated Retail Replacement Value; (2) Estimated Retail Replacement Cost; (3) Appraised Retail Value; (4) Total Estimated Value Based on Retail Replacement; (5) Market Value.

20. The term of the TERRITORIAL DISTRIBUTORSHIP will be 35 years commencing on the date of this agreement.

21. The TERRITORIAL DISTRIBUTORSHIP will include the Territory described in Exhibit D.

22. TERRITORIAL DISTRIBUTOR is authorized to appoint agents and dealers within the Territory.

23. In consideration of the Territorial Distributorship transferred herein, TERRITORIAL DISTRIBUTOR SHALL pay to DISTRIBUTOR a Principal Sum as set forth in Exhibit A, Part I, and purchase PRODUCT from IMPORTER as set forth in Exhibit A, Part II.

  &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

25. TERRITORIAL DISTRIBUTOR specifically represents and understands as follows:

(a) That he has sufficient business experience to operate his Territorial Distributorship.

(b) That he has the financial capacity to develop the Territory.

(c) That he intends to personally promote the PRODUCT in the Territory acquired or cause promotion to be effected within the Territory.

(d) That, as a TERRITORIAL DISTRIBUTOR, he will not be entitled to participate with other TERRITORIAL DISTRIBUTORS with reference to expenses, profits, or otherwise. Further, that his profits, if any, earned as a TERRITORIAL DISTRIBUTOR will depend solely on his own management and marketing ability, and not that of the DISTRIBUTOR or the IMPORTER or any affiliate.

(e) That he has read the Tax Opinion Letter addressed to DISTRIBUTOR by the law firm of SOMERS & ALTENBACH, and he understands that the tax incidents involving his becoming a TERRITORIAL DISTRIBUTOR may vary from those of other individual TERRITORIAL DISTRIBUTORS, and there can be no assurance that the Internal Revenue Code or the Regulations thereunder, as they exist or as they may be amended, will allow any TERRITORIAL DISTRIBUTOR the tax benefits referred to in the Tax Opinion Letter.

(f) That he believes there is a realistic possibility of profits from the operation of the TERRITORIAL DISTRIBUTORSHIP.

(g) That, as a TERRITORIAL DISTRIBUTOR, he will *not* be entitled to utilize any trademark or trade name of DISTRIBUTOR or IMPORTER.

(h) That the MINIMUM PRODUCT PURCHASE REQUIREMENT of Colored Precious Gems is not purchased as a part of the inventory of the TERRITORIAL DISTRIBUTOR for resale, and that the TERRITORIAL DISTRIBUTOR will continue to hold those Colored Precious Gems for purpose of display to prospective customers.

The agreement incorporates a "Security Agreement" which provides that any nonrecourse note used to pay a portion of the "Principal Sum" would be secured by an interest in all of the territorial distributor's rights in his distributorship, including an interest in all "receivables and inventory owned * * * pursuant to the" territorial distributorship. The principal sum is the amount the territorial distributor is to "pay" for his territorial distributorship. As will appear more fully hereinafter, no such "Principal Sum" is set forth in the body of the agreement.

Following the Territorial Distributorship Agreement and the Security Agreement are a number of exhibits designated A through F, applicable to either agreement wherever reference is made in either to an exhibit. Part I of Exhibit A specifies the requirements for payment of the principal sum. It obligates the territorial distributor to deliver, upon execution of the agreement, a recourse note for one-twelfth of the principal sum. Thereafter, on December 1 of each of the following 11 years starting with 1980, the territorial distributor is to tender cash or a recourse note or a nonrecourse note, or some combination of any two or all three, totaling one-twelfth of the principal sum. Although Exhibit A refers to the "Principal Sum" in accordance with paragraph 23 of the Territorial Distributorship Agreement, it does not set forth the amount of that "Principal Sum" but merely makes reference to Exhibit D, which purportedly fixes the amount of the "Principal Sum."

Part II of Exhibit A binds the territorial distributor to purchase certain "Minimum Product" from American Gold. In 1979, the territorial distributor is required to buy, for cash:

A. * * * Product C or D (Colored Precious Gems) having an aggregate appraised Estimated Market Retail Price of not less than twenty-five (25%) percent [of that portion] of the Principal Sum Annual Installment [paid in cash or financed with a recourse note], or, in the alternative;
B. * * * Product C or D (Colored Precious Gems) having an aggregate Estimated Market Retail Price of not less than $5,000 *and* Product A (Diamonds) for the difference between the minimum cash purchase provided for in Paragraph A and the cost of Product C or D multiplied by 2.5.

Unlike the favorable prices at which gems would be sold generally to the territorial distributor for resale, the prices to be paid for the minimum product were fixed in the agreement, as follows:

C. With reference to the Minimum Product Purchase Requirement only, the price for Product C or D (Colored Precious Gems), will be one hundred (100%) percent of its Estimated Market Retail Price. With reference to the Alternative Minimum Product Purchase Requirement including Product A (Diamonds) and Product C or D, the price for Product A will be fifty eight (58%) percent of its Estimated Market Retail Price.

In the years subsequent to 1979, the same formula for purchase of minimum product appears to have been applicable except that the territorial distributor is explicitly relieved of the requirement to purchase any product C or D. In this respect, paragraph D of part II of Exhibit A, after setting forth the minimum product purchase requirement, states "except that *no* minimum purchase of Product C or D will be required." However, paragraph E of part II of Exhibit A further indicates that in such later years the "selection of the particular PRODUCT A, C or (D) for the purpose of the Minimum Product Purchase Requirement * * * shall be at the discretion of Importer." The seeming or possible contradiction between the statement "that *no* minimum purchase of Product C or D will be required" and American Gold's right to determine which product must be purchased, is unexplained.

Exhibits B and C are the "FORM" recourse promissory note and the "FORM" nonrecourse promissory note, respectively, to be used by the territorial distributor in making his principal sum payments to U.S. Distributor. Each note is payable in five

equal annual installments commencing on December 31, 2004, and bears "Interest (not compounded) at the rate of six (6) percent per annum * * * payable in full with the first principal installment." Prepayments are allowed and, indeed, are required by paragraph 16 of the Territorial Distributorship Agreement, but are first to be applied against interest. However, such prepayments are required only to the extent that (and measured by a percentage of) any product—other than minimum product—purchased by the territorial distributor from American Gold. But there is no requirement that the territorial distributor purchase any product whatever other than minimum product, and no prepayment is required in connection with the purchase of minimum product. Further, since the purchase of minimum product is required only in an amount equal to one-fourth of that part of the annual installment paid for the distributorship in cash or by recourse note, and since the distributor has the option of paying every installment in full after 1979 with a nonrecourse note, he is under no obligation whatever to purchase minimum product after 1979 to the extent that he chooses to use nonrecourse notes. The recourse note is unsecured, but liability thereon is "not limited to any prepayment obligation, specific collateral or otherwise." The nonrecourse note is secured only by the Security Agreement.

Exhibit D is a form for identifying the territorial distributor's assigned distributorship territory, "Minimum Product Purchase Requirement," and principal sum. It was left blank at the time the Territorial Distributorship Agreement was purportedly entered into by petitioner, U.S. Distributor, and American Gold. No specific territory was then[2] assigned to petitioner, nor was the amount of the "Principal Sum" set forth as called for by Exhibit A.

Exhibit E, a duplicate of Exhibit B, is the form recourse note to be actually executed and used in making the first principal sum payment, the payment due upon the execution of the agreement. Exhibit E in the agreement purportedly entered into by petitioner was filled in and dated by him on December

---

[2]As will appear hereinafter, there were only two possible dates when the agreement might arguably have been entered into: Dec. 27, 1979, and Feb. 29, 1980. At neither of those dates was there any executed Exhibit D identifying any territory purportedly assigned or to be assigned to petitioner.

27, 1979. Since the purported purchase price for his distributorship was $384,000 (an amount confusingly not appearing anywhere in the agreement),[3] the principal sum of the Exhibit E recourse promissory note signed by petitioner was, in accordance with Exhibit A, one-twelfth of that $384,000 purchase price, namely, $32,000.

Although the Territorial Distributorship Agreement begins with the words "The undersigned represent and agree as follows," nowhere in the body of that agreement is the identity of the territorial distributor disclosed or referred to, nor is that agreement signed at the end thereof by any of the parties, nor is it dated either in the body or at the end thereof. The only place where there is provision for date and signatures of the "undersigned" parties in respect of the agreement, itself, is Exhibit F.

Exhibit F was a blank form, which, prior to being filled in and signed by petitioner, read as follows:

### EXHIBIT F

The undersigned acknowledges that he has either read or has had available to him for reading all of the "TERRITORIAL DISTRIBUTORSHIP CONTRACT DOCUMENTS" which consist of a SUMMARY OF BUSINESS OPPORTUNITY, a TAX OPINION LETTER, and a TERRITORIAL DISTRI-BUTORSHIP AGREEMENT. Signatures on this page relate to the entire TERRITORIAL DISTRIBUTORSHIP AGREEMENT, including the SECU-RITY AGREEMENT, and to EXHIBITS A, B, C, D, E, F, and G, and the signatures signifiy that the signer has read and understands the entire TERRITORIAL DISTRIBUTORSHIP AGREEMENT, including the EXHIB-ITS attached thereto.

In the event that Territorial Distributor makes no choice of total Territory, or that the Territory chosen is not available, DISTRIBUTOR is authorized to designate a Territory for him.

Signature of TERRITORIAL
DISTRIBUTOR and DEBTOR

\*       \*       \*       \*       \*       \*       \*

[3]The purchase price does not appear- in the body of the agreement, and although there is a place therefor on the form constituting Exhibit D, that exhibit was left entirely blank, as noted above, at whatever date the agreement may conceivably be considered as having been entered into. See note 2 *supra*. As will appear hereinafter, the amount was entered on two different Exhibits D dated July 30, 1980, and Oct. 22, 1980, which were inconsistent with each other in the identification of the territory purportedly assigned to petitioner.

ACCEPTANCE

The undersigned hereby accepts the above named as a TERRITORIAL DISTRIBUTOR and DEBTOR.

Executed at Carson City, Nevada as of _____

U.S. DISTRIBUTOR, INC. AMERICAN GOLD & DIAMOND CORPORATION

By _____ By _____

Petitioner signed and dated Exhibit F on December 27, 1979, but the portion of Exhibit F calling for acceptance and signature on behalf of the other parties to the agreement, namely, U.S. Distributor and American Gold, was left blank. Another copy of Exhibit F was executed on February 29, 1980, on behalf of U.S. Distributor and American Gold. That copy was sent to petitioner; it contains petitioner's signature, but there is no date opposite that signature. That second copy of Exhibit F has been stapled to the inside cover of petitioner's retained "Contract Documents" pamphlet containing the Territorial Distributorship Agreement.

Exhibit G is a "RECEIPT FOR PAYMENT TO INDEPENDENT CONTRACTOR," to be used to evidence the territorial distributor's cash and/or recourse note payments to Professional Escrow Service, Inc. ("Escrow" or the "Escrow company"), which apparently was to act as escrow agent for American Gold and U.S. Distributor. Prior to being filled in, Exhibit G read as follows:

EXHIBIT G

RECEIPT FOR PAYMENT TO INDEPENDENT CONTRACTOR

The undersigned receipts for a check payable to Professional Escrow Service, Inc., in the amount of $ _____ and a RECOURSE NOTE in the amount of $ _____. The check and the RECOURSE NOTE mentioned above shall be mailed forthwith to Professional Escrow Service, Inc., 300 Hot Springs Road, Suite 20, Carson City, Nevada 89701.

| | |
|---|---|
| Signature of INDEPENDENT CONTRACTOR | Print Name |
| Street Address | City - State - Zip |
| ( ) | |
| Telephone Number | |

INSTRUCTIONS TO EARL MARTINSON, INC., REPRESENTATIVE:

You have two copies of the TERRITORIAL DISTRIBUTORSHIP CON-
TRACT DOCUMENTS with the same number. Exhibits D, E, F and G in
each Manual must be filled out and fully executed. One of the Manuals is to
be given to the TERRITORIAL DISTRIBUTOR, and the other is to be mailed
to Professional Escrow Service, Inc. After acceptance by DISTRIBUTOR and
IMPORTER an executed copy of Exhibit F will be mailed to the TERRITORI-
AL DISTRIBUTOR for insertion in the copy of the Contract Documents
retained by the TERRITORIAL DISTRIBUTOR.

It was filled in (by hand) solely by insertion of the amount of
$1,000 in respect of the check. Everything else was left blank.
Earl Martinson, Inc., is not identified in the record, but seems
in some fashion to have assisted in the marketing of the
program.

At the time that petitioner signed the Exhibit E $32,000
promissory note, December 27, 1979, he was theoretically
obligated by Exhibit A (if the Territorial Distributorship
Agreement were to be regarded as having then been fully in
effect) to purchase minimum product from American Gold in
an amount of not less than 25 percent of that note, i.e., not less
than $8,000. The $1,000 check referred to in Exhibit G was
intended to be in partial fulfillment of that obligation. And
although Exhibit A to the agreement required that the
minimum product be purchased for cash, petitioner at the
same time on December 27, 1979, executed a note in the
amount of $7,000 for the remainder of his obligation in respect
of the $8,000 minimum product purchase requirement. That
$7,000 note bore interest at the rate of 10 percent a year. It is
petitioner's position that the requirement of purchase for cash
was orally waived to the extent of the $7,000 note. The $7,000
note was payable to the Escrow company, and was due on
December 31, 1979. It has not been paid.

At the time of petitioner's signing of the various documents
referred to above on December 27, 1979, there was present
John Knowles, then president and authorized representative
of U.S. Distributor. Mr. Knowles did not then sign the
agreement or any document purporting to bind U.S. Distribu-
tor. Among the documents delivered to U.S. Distributor or the
Escrow company at that time was a worksheet identifying the
territory or territories being requested by petitioner. He
purports to have relied upon alleged oral assurances by Mr.
Knowles that the territory primarily desired by him, near his

office in Encino, California, would be assigned to him. However, as indicated above, when Exhibit F was finally executed on behalf of U.S. Distributor and American Gold on February 29, 1980, no territory whatever was assigned to petitioner. At that time, Mr. Knowles signed for U.S. Distributor in his capacity as president, and a person named Glen Symons signed as "attorney-in-fact" for American Gold.

On December 28, 1979, petitioner delivered a $100 check to Gem-mart in payment of fees "due" under the terms of a "Consulting Contract." However, that contract was not executed until February 29, 1980, at the same time that the basic agreement between petitioner and U.S. Distributor and American Gold was executed. Under the "Consulting Contract," Gem-Mart was to assist petitioner in the merchandising of American Gold's product, inter alia, by negotiating with jewelers on petitioner's behalf. The contract specifically declared that Gem-Mart was "retained to produce results" but that Gem-Mart would make no "business decisions" and would have no power to "contract" on petitioner's behalf.[4] In return for Gem-Mart's services in arranging sales, petitioner agreed to pay Gem-Mart 50 percent of gross profits.

Petitioner's $384,000 purported purchase of the distributorship was the largest purchase he had ever made. In deciding whether to purchase a distributorship, petitioner did not investigate any other gem distributorship program.

At the time petitioner signed the agreement, he had only "reasonable" assurances as to the area in which he would be the exclusive distributor of American Gold's product. Although he had been informally advised that he would receive a territory within Zip Code 91436 in Encino, California, one within Bethesda, Maryland, and one within Galway, Ireland, such assignments were not guaranteed and he could be allotted other areas. And, as noted above, Exhibit D to the executed agreement (whether the date of execution be treated as December 27, 1979, or February 29, 1980) which should have identified petitioner's exclusive territory, was left blank.

---

[4]The evidence, however, establishes that Gem-Mart did in fact make "business decisions" and carried out transactions without consulting petitioner in connection with any sales arranged by it. As will appear hereinafter, no sales were in fact made in petitioner's exclusive territory and the sales actually made are referred to hereinafter as "random" or "casual" sales.

Petitioner was not finally assigned his exclusive territory until October 1980. On August 25, 1980, petitioner received a completed Exhibit D dated July 30, 1980, indicating that his territory for distributing American Gold's product would be the areas defined by Zip Codes 91316 in Encino, California, and 20014 in Bethesda, Maryland, and the cities of Galway and Waterford, Ireland. An "Addendum" to this exhibit which "clearly sets forth * * * the jewelry outlets that comprise * * * [petitioner's] Territorial Distributorship," listed the names of four outlets each in the foregoing Encino and Bethesda zip code areas.

However, on October 24, 1980, petitioner received a letter advising him that he had been incorrectly assigned jewelry outlets and, thus, was then allotted "two new Zip Codes in Bethesda, each of which has only one jewelry outlet in it, and * * * two additional outlets in Encino." An enclosed "new" Exhibit D, dated October 22, 1980, listed four zip code areas— 91316 and 91436, in Encino, and 20015 and 21237 in Bethesda—and the cities of Galway and Waterford in Ireland. The "Addendum" to this exhibit recorded five outlets in the 91436 Zip Code and one in each of the other three zip code areas. Only one of the outlets listed in the latter "Addendum," the one in the 91316 Zip Code area, appeared on the earlier list. Petitioner does not now know whether any of the jewelers named on the addendum are currently in business. In explaining the need for changing petitioner's territory, the second letter (signed by Glen Symons for the Escrow company) stated that "we discovered that Penni had been assigning jewelry outlets incorrectly." The identity of Penni, her position, and her authority to make assignments of territories were undisclosed.

Neither of the above-described Exhibits D made clear whether petitioner had been assigned specific geographic areas or simply certain outlets within such areas. At trial, petitioner was unable to resolve this confusion. Indeed, he was uncertain as to what the status of his distributorship would be if those outlets listed on the "Addendum" closed or moved from his assigned exclusive territory, or whether he was exclusively entitled to distribute to outlets thereafter commencing business within those areas. Also, although he "understood" that he was allowed to sell directly to individuals

within his territories, he was not sure whether the agreement permitted such activity.

Petitioner remained a territorial distributor through the date of trial. He discharged his obligation to pay one-twelfth of his principal sum amount in 1980 by delivering to U.S. Distributor an agreement Exhibit B recourse promissory note in the amount of $16,000 and an agreement Exhibit C nonrecourse promissory note also in the amount of $16,000. Each note was dated December 31, 1980, was interest-bearing, and was payable in five equal annual installments beginning December 31, 2004.

In approximately September of 1981, petitioner executed a "Modification of Contract" (modification or Modification Agreement) which altered essential terms of the agreement. The principal changes made by the modification included the elimination of the interest provisions of the recourse and nonrecourse notes used to finance principal sum payments, an increase in the price to territorial distributors of products C and D, and a reduction, in some instances, of the prepayment amount required by paragraph 16 of the agreement.[5] The purpose of these alterations was to conform the contractual terms of the agreement as signed by petitioner in 1979 with later agreements made during 1980 and 1981 with other, new territorial distributors. Apparently, the later agreements differed in many ways from that signed by petitioner.

Attached to the Modification Agreement were copies of seven promissory notes, six of which petitioner had executed. Three of these notes, two "recourse" in the amounts of $32,000 and $16,000 and one "nonrecourse" in the amount of $16,000, were intended as substitutes for the promissory notes petitioner used in 1979 and 1980 in making his principal sum payments. These three new notes reflected the changes made by the Modification Agreement, including the elimination of

---

[5] Par. 16 of the agreement provided for prepayments on "all Principal Sum Annual Installment Promissory Notes * * * in the amount of ten (10%) percent of the total cost of" product purchased from American Gold. A statement within the body of the modification read, in part, "prepayment requirements on notes when purchasing product have been reduced from ten and twenty percent to five and ten percent." Promissory notes attached to the modification contained a paragraph which called for prepayments which varied depending upon the type of product a distributor purchased. However, see *supra*, p. 83, as to the illusory character of the prepayment requirement. The reduction in the modification would be applicable only if a territorial distributor purchased any product (other than minimum product), and he was under no obligation to make any such purchase.

the interest requirement. They were "Dated as of:" January 1, 1981, and, like the old notes, were payable in five annual installments, but to begin on December 31, 2006, two years later than the old notes. Two other similar notes, one "recourse" and one "nonrecourse," each in the amount of $16,000 and each "Dated as of" December 31, 1981, were in payment of petitioner's 1981 principal sum obligation. A final note, carrying a 10 percent per annum interest rate but no due date, in the amount of $4,000 was "For use in 1981 for Minimum Product Purchase."

The Modification Agreement and its attachments could at best be described as confusingly inexact and unprofessional. For example, it makes reference to certain pages and paragraphs allegedly in the agreement, but these references in no way correspond with the appropriate paragraphs in the agreement. However, even though petitioner "acknowledged that he * * * [had] read the * * * [m]odification and * * * compared the language of his original agreement with the language of the modification," he could not resolve the confusion, nor could he recall "noting" the inaccuracies at the time he signed the modification. Also, a paragraph contained in the attached "nonrecourse" notes reads:

This is a Non-Recourse Note. *Maker's liability is not limited to any prepayment obligation, specific collateral or otherwise.* [Emphasis supplied.]

Petitioner concedes that this is the definition of a recourse, not a nonrecourse, note (indeed, the emphasized sentence above is found verbatim in the recourse notes), but he could not explain this glaring inconsistency.[6] A further instance of drafting nonsense is a provision in the Modification Agreement purporting to modify a 20-percent prepayment requirement (see note 5 *supra*, p. 89) although there is admittedly no such 20-percent prepayment obligation in the agreement.[7]

Petitioner has made no attempt to retrieve the original notes replaced pursuant to the Modification Agreement. He

---

[6]Upon being shown this inconsistency at the trial, petitioner exclaimed, "I'll be darned."

[7]It is conceivable that the 20-percent figure appears in the "Contract Documents" pamphlet that was used for 1981 and possibly for 1980. However, the Modification Agreement as it relates to petitioner should properly have been made applicable to the Territorial Distributorship Agreement signed by him that was contained in the 1979 version of the "Contract Documents" pamphlet. No copy of the 1980 or 1981 "Contract Documents" pamphlet was attached to the Modification Agreement or made available to the Court.

regarded the notes as being possibly negotiable, and indicated that, as a lawyer, in the ordinary course of business, he would never substitute a new promissory note for an old note without having the old note returned. Nevertheless, he has not recovered possession of those notes replaced pursuant to the Modification Agreement, nor does it appear that he made any effort to obtain them. His apparent indifference to leaving outstanding multiple copies of these executed notes representing the same liability was in marked contrast to his attitude in respect of possible outstanding duplicate copies of his executed Exhibit E recourse promissory note. Since the agreement was executed purportedly in duplicate original and since it was petitioner's retained original copy (containing a signed Exhibit E recourse promissory note) that was before the Court, he was questioned whether he had signed both an original as well as a duplicate Exhibit E recourse promissory note. He replied "Of course not. I wasn't that crazy."

Petitioner discharged his yearly obligation to pay one-twelfth of his principal sum in 1982 and 1983 by delivering each year to U.S. Distributor a nonrecourse note in the amount of $32,000. The 1982 nonrecourse note was a filled-in copy of the agreement Exhibit C form nonrecourse note with the provisions relating to interest crossed out. This note was dated December 27, 1982, payable in five equal annual installments commencing December 31, 2004. The 1983 nonrecourse note was substantially different from both the Exhibit C form note and the nonrecourse notes attached to the Modification Agreement. The five equal annual payments on this note were to begin on December 31, 2008, and prepayments were required in an amount other than that required by the agreement as altered by the Modification Agreement. This note was "Dated as of" October 24, 1983.

The agreement required petitioner to purchase, for cash, minimum product with an "Established Market Retail Price" of not less than 25 percent of that part of his annual principal sum payment paid in cash or financed with a recourse promissory note. Thus, petitioner should have purchased, for cash, minimum product with a "Retail Price" of at least $8,000 in 1979, $4,000 in 1980, and $4,000 in 1981. However, he actually purchased only $1,000 of minimum product for cash.

He neither purchased nor received any further minimum product.

In 1979, petitioner purported to meet his minimum product purchase requirement by tendering to the Escrow company the $1,000 check and the $7,000 promissory note described above. See p. 86 *supra*. Thereafter, on April 28, 1980, petitioner received minimum product consisting of nine product C type gems for his $1,000 check.

Aside from the nine Product C type gems received in April 1980, petitioner never obtained further minimum product, which, pursuant to the agreement, could not be resold. Shortly after entering into the agreement, he arrived at an oral understanding with Crooks that relieved him of his obligation to make any further purchases of minimum product.

Notwithstanding his apparent agreement with Crooks, petitioner tendered to the Escrow company one promissory note in 1980 and one in 1981, each in the amount of $4,000, in respect of his minimum product purchase requirement.[8] However, an "Agreement," in evidence, referring to the "promissory note executed by [petitioner] * * * on December 31, 1980," read, in pertinent part: "AMERICAN GOLD & DIAMOND CORPORATION agrees that the dollar amount of any purchase of PRODUCT * * * by the maker of the promissory note shall be credited as a payment on said promissory note." This "Agreement" was "Dated: As of" December 31, 1980, and was signed for American Gold by Crooks as "Attorney in Fact." The $4,000 promissory note dated December 31, 1980, has not been returned to petitioner.

No writing similar to that of the foregoing in respect of petitioner's 1980 minimum product purchase requirement exists with respect to either his 1979, $7,000 or 1981, $4,000 obligations. At trial, petitioner initially testified that he "consider[ed] [himself] * * * relieved of the obligation to comply with the terms of" the 1979 note, but was unable to state that he had reached such an understanding with anyone authorized to represent American Gold. (Although petitioner testified about an oral understanding with Crooks, see *above*, there was no indication that Crooks represented or even purported to represent American Gold in this connection.)

---

[8] The note for 1981 was that $4,000 note attached to the Modification Agreement. See *supra*, p. 90.

Later, petitioner changed his testimony, admitting, instead, that "Although I have not had the opportunity to check with American Gold * * * to see what their attitude is, as to whether or not they feel I still owe them the $7,000 and whether or not they still owe me the minimum product if I pay it. I just don't know the current status of that. I haven't had a chance to discuss it." He did "believe," however, that the 1981 $4,000 note "has been satisfied." Petitioner has not attempted to learn whether the 1979, $7,000 note has been canceled.[9]

In connection with petitioner's transactions involving gemstones, he adopted the fictitious name "Euhedral Enterprises" (Euhedral). In December 1980, he registered such name with the Los Angeles City County Recorder and applied for and received "City of Los Angeles Business Tax Registration Certificate[s]" authorizing Euhedral to make retail and wholesale sales. In addition, he applied for and, in 1981, received a "Seller's Permit" from the California State Board of Equalization. Also, petitioner purchased stationery and business cards bearing Euhedral's name and opened checking accounts in its name in California and North Dakota.[10] During 1980, 1981, 1982, 1983, and 1984, petitioner paid business taxes to the city of Los Angeles in the amounts of $38.75, $47.95, $60.67, $52.50, and $54.93, respectively. During 1981 through 1983, he filed quarterly "State, Local and District Sales and Use Tax Return[s]" with the California Board of Equalization, but, since he had no sales subject to California sales tax, such returns showed no tax liability. In Maryland where he had no sales, he neither filed any sales tax returns nor paid any sales taxes.

Petitioner has never, at least until the date of trial, sold any of American Gold's product in any part of his assigned exclusive territory. Although he was aware that, notwithstanding his contract with Gem-Mart, he initially had to approach prospective purchasers, he has never contacted, either in person or otherwise, any jeweler in his assigned territory for the purpose of selling or even exploring the possibility of selling American Gold's product. At the time he

---

[9]No evidence was presented concerning whether the 1981 $4,000 note has been canceled.

[10]Petitioner opened a checking account in 1983 in North Dakota in connection with a relationship he established with Warren Johnson, a traveling salesman, who, as set forth more fully hereinafter, sold jewelry in North Dakota, Minnesota, and Wisconsin.

entered into the Territorial Distributorship Agreement, he had no intention of then visiting any jeweler in Bethesda or Ireland. Currently, he states that he has no interest in approaching any jeweler until the diamond market "improves" and has not acquired any "display" diamonds to use to arouse purchasers' interest. He has never taken custody of any gemstones other than the nine minimum product items previously discussed, which he had purchased for $1,000.

During 1980 petitioner from time to time received form communications from Gem-Mart which were apparently being sent to all other territorial distributors. In general, these communications announced the availability of various gems for purchase by the territorial distributors which Gem-Mart would in turn undertake to resell in accordance with the "Consulting Contract" between the individual territorial distributor and Gem-Mart. In some of the communications there was pointed reference to the tax benefits and the importance of showing some sales activity before the end of the year in order to obtain full tax benefits. Petitioner nevertheless made no purchases of any gems for resale at any time until December 1980.

In response to a communication from Gem-Mart dated December 8, 1980, announcing the availability of certain colored gems to be imported from Brazil, petitioner sent a letter, also dated December 8, 1980, to Frank Davis as president of Gem-Mart in Provo, Utah, transmitting a $15,000 check payable to "Gem-Mart Trust Fund." He stated that the funds transmitted were "to be applied to your program concerning the import and sale of colored stones." He added that it was his understanding that Gem-Mart would be able to conclude a purchase and sale of colored stones on his behalf prior to the close of the year, obviously intending thereby to support a claimed deduction for 1980. On or about December 12, 1980, Gem-Mart, without any further consultation with petitioner, used $10,366.50 of this money to purchase eight noninvestment grade diamonds, but not any imported colored Brazilian gems. By the end of December 1980, it sold some of the diamonds for a total of $8,923. Petitioner determined that the cost of the diamonds thus sold was $7,931. None of the stones was sold to any purchaser within petitioner's assigned

exclusive territory, nor does it appear that any effort was even undertaken to make any such sale in such territory.

Gem-Mart also sold gemstones on petitioner's behalf through a joint venture program it created in 1981. Under this program, Gem-Mart pooled the resources of participating territorial distributors and then bought and sold gemstones on behalf of all participants in proportion to their respective interests in the joint venture. Each participant was credited with a proportionate share of the venture's sales and profits. As previously noted, petitioner in December 1980 had transmitted $15,000 to Gem-Mart for use in the purchase and sale of gemstones on his behalf; and in February 1983, he transmitted an additional $5,000 to be added to the amount credited to him by Gem-Mart for use in the joint venture. None of Gem-Mart's sales on behalf of the joint venture was made to purchasers in petitioner's assigned exclusive territory.

Petitioner was also involved in a program, "[b]y virtue of [his] * * * contractual agreement with Gem-Mart," through which he, along with other interested territorial distributors, financed jointly the purchase of inventory to be placed for sale with the Philip Michaels Jewelry Store (Philip Michaels) located inside the Denver, Colorado, Marriott Hotel. Petitioner, in February 1983, sent a $5,000 check to Gem-Mart representing his pro rata investment in that project. Participants in this program shared part of the profit on the sale of the financed inventory. Philip Michaels was owned by a corporation, DaMar Management Co.'s, Inc., which in turn was owned, in part, by Davis. Davis' indirect ownership of Philip Michaels was not disclosed to the territorial distributors; rather, it was represented to them that DaMar was "not affiliated" with Gem-Mart. As of December 1983, petitioner was treated as having $5,732.64 invested in the Philip Michaels venture.

Gem-Mart not only offered territorial distributors the above-described programs but also circulated "updates" and "Special Sale Bulletins." These publications were intended to educate territorial distributors about the gemstone industry, to provide information concerning Gem-Mart, and to announce special purchase opportunities and sales programs. Also, they often warned (as indicated above) that, for example, "it is most important that you show some sales activity within your

Territorial Distributorship before the end of the year—in order to have full tax benefits," or "it is this type of purchase which establishes proof of authentic business operation of your Territorial Distributorship for the IRS." In addition, the "Updates" contained a section called "The Late Update" which often discussed tax-related issues such as tax reform, tax collection, and the problem of so-called tax protesters.

Gem-Mart's sales programs were petitioner's only marketing outlet for American Gold's product until March 1983. He then made arrangements with a traveling salesman named Warren Johnson (Johnson) to sell product in Johnson's sales territory, basically North Dakota, Minnesota, and Wisconsin. Petitioner was introduced to the opportunity of selling through a salesman by Dick Koons, who had sold distributorships and who was himself also a territorial distributor in Fargo, North Dakota. Petitioner has never met Johnson.

Petitioner reported the following gross sales from the purchase and sale of American Gold's product:

|  |  | *Sales by:* | |
| --- | --- | --- | --- |
|  |  | *Philip* | *Warren* |
| *Year* | *Gem-Mart* | *Michaels* | *Johnson* |
| 1980 | $8,923.00 | 0 | 0 |
| 1981 | [11]74,439.00 | 0 | 0 |
| 1982 | 25,851.00 | 0 | 0 |
| 1983 | 18,917.71 | $2,214.35 | $3,193.95 |

None of these sales occurred in any part of petitioner's assigned territory. Petitioner had no expectation that any individual employed by either Gem-Mart or American Gold would attempt to sell product within his territory.

If the foregoing sales of American Gold's product on petitioner's behalf are to be regarded as having been made pursuant to his Territorial Distributorship Agreement, his purchase of the merchandise involved should have resulted in a reduction in the amounts he owed U.S. Distributor under the notes he used to finance his principal sum payments. Pursuant to paragraph 16 of the agreement, a certain portion of the

---

[11]Petitioner's only investment with Gem-Mart through 1981 was his original $15,000 check in December 1980. The $74,439 sales, which yielded a "total income" of $7,297 prior to allocating 50 percent thereof to Gem-Mart as its share, obviously were made in substantial part out of a revolving fund based on reinvestments of proceeds of sales stemming from petitioner's original $15,000 investment.

amounts petitioner owed to U.S. Distributor should have been paid to U.S. Distributor each time purchases of American Gold's product were made by him or on his behalf. Although statements from Gem-Mart indicate that it withheld such payments before crediting petitioner with sales proceeds,[12] the record does not establish that such funds were in fact paid to U.S. Distributor or that, if indeed the payments were made, U.S. Distributor made any notation, either on the notes or otherwise, reflecting such payment.

Petitioner elected to use the accrual method of accounting for reporting income and expenses with respect to his territorial distributorship. On Schedule C of his respective Federal individual income tax returns, he reported the following with respect to his alleged operation of the distributorship:

| Year | Total[13] income | Deductions | Net profit or (loss) |
|------|------------------|------------|----------------------|
| 1979 | 0 | $32,100 | ($32,100) |
| 1980 | $992 | 19,265 | (18,273) |
| 1981 | 7,297 | 19,745 | (12,448) |
| 1982 | 4,643 | 2,328 | 2,315 |
| 1983 | 4,627 | 1,382 | 3,245 |

The deductions in the above table consisted of the following components shown on the respective Schedules of petitioner's returns for the years 1979–83:

*1979*

| | |
|---|---|
| Distributorship fee | $32,000 |
| Consulting fee | 100 |
| | 32,100 |

---

[12]Another confusing aspect of this case that petitioner could not clarify concerns the amount of these withholdings. Documents in evidence indicate that Gem-Mart withheld, as repayments of the notes petitioner used to finance his principal sum payments, amounts ranging from 12½ to 5 percent of petitioner's share of profit on Gem-Mart sales made on his behalf. Petitioner could not "specifically" explain the difference in percentages, but did allude to the changes the modification made to the prepayment obligation. However, these changes (to the extent applicable to petitioner) merely reduced the obligation from 10 percent to 5 percent. Also, although the agreement and the modification require prepayments based upon a percentage of "total cost of TERRITORIAL DISTRIBUTOR for all PRODUCT purchased," Gem-Mart appears to have withheld a smaller amount, based upon a percentage of gross profit, not a percentage of cost.

[13]Total Income = Sales – Cost of Goods Sold + Other Income. The only items of "other income" reflected in the above table were $117 in 1982 identified as "Misc." and $197 in 1983 identified as "Interest."

*1980*

| | |
|---|---|
| Bank charges | $80 |
| Commissions | 496 |
| Interest | 2,620 |
| Office supplies | 30 |
| Taxes | 39 |
| Distributorship fee | 16,000 |
| | 19,265 |

*1981*

| | |
|---|---|
| Commissions | 3,649 |
| Interest | 48 |
| Taxes | 9 |
| Distributorship fee | 16,000 |
| License | 39 |
| | 19,745 |

*1982*

| | |
|---|---|
| Bank service charges | 3 |
| Commissions | 2,264 |
| Taxes | 61 |
| | 2,328 |

*1983*

| | |
|---|---|
| Bank service charges | 32 |
| Commissions | 1,297 |
| Taxes | 53 |
| | 1,382 |

The "Distributorship Fee[s]" in the amounts of $32,000 for 1979, $16,000 for 1980, and $16,000 for 1981 represent the amounts of the recourse notes petitioner employed in each of those years in making his annual principal sum payments. The 1980 interest deduction of $2,620 equals $1,920 (the 6-percent simple interest with respect to the 1979–$32,000 recourse promissory note), plus $700 (the 10-percent simple interest with respect to the 1979–$7,000 note). Petitioner did not report as income in his 1981 return the 1981 forgiveness of the $1,920 interest component. Nor did he report as income the $700 interest component for any year in which his liability on the $7,000 note may be regarded as terminated. All of the "Commissions" for the years 1980–82 and substantially all of the "Commissions" for 1983 represented Gem-Mart's 50-percent share of the profits on sales which it generated.

On October 6, 1982, petitioner filed Form 5213, "Election to Postpone Determination with Respect to the Presumption that an Activity is Engaged in for Profit," with the Internal Revenue Service Center at Fresno, California. He thus made the election set forth in section 183(e), I.R.C. 1954, to "postpone a determination whether the presumption that an activity * * * is engaged in for profit until the close of * * * the fourth taxable year * * * following the taxable year in which first engaged in such activity." On the Form 5213, he described his "for Profit" activity as the:

Ownership, operation, development and exploitation of a wholesale and/or retail investment gem and/or jewelry business under the terms of a license and/or territorial distributorship agreement entered into between the taxpayer and his licensor and/or distributor in 1979, or otherwise.

In his deficiency notice herein, dated April 11, 1983, the Commissioner disallowed the losses petitioner claimed on Schedule C of his 1979 and 1980 returns with respect to the operation of his territorial distributorship. The Commissioner explained his determination as follows:

1. You have not established that this amount was paid, or if it was paid, that it is an allowable deduction under any section of the Internal Revenue Code of 1954.
2. You have not established that your activities in your alleged distributorship were not sham transactions to create artificial tax losses.
3. You have not established that your activities in your alleged distributorship amounted to carrying on any trade or business within the meaning of Section 162 of the Internal Revenue Code of 1954, or were activities within the meaning of Section 212 of the Internal Revenue Code of 1954.
4. You have not established that your alleged payment of a Distributorship Fee qualifies under Section 1253 of the Internal Revenue Code of 1954.

He further determined that, if the above reasons were not sustained, petitioner's use of the accrual method of accounting materially distorted his income and that, pursuant to section 446(b), I.R.C. 1954, he would be required to utilize the cash receipts and disbursements method of accounting in reporting his income with respect to the operation of the territorial distributorship. Additionally, he determined that the notes used to pay the "Distributorship Fee" were not bona fide debt obligations.

OPINION

This case involves a tax shelter structured as an exclusive territorial franchise to distribute gemstones and items of jewelry in an attempt to take advantage of section 1253(d)(2)(B)(ii) of the Internal Revenue Code of 1954.[14] The principal tax benefit sought under these provisions is the deduction of a "Distributorship Fee" in the amount of "recourse" notes given by the exclusive territorial franchisee as installment payments for his distributorship. In this case, petitioner purported to purchase in 1979 a distributorship for $384,000, payable in 12 annual installments of $32,000 each. The deductions primarily at issue are the face amount of a $32,000 "recourse" note given by him as the first installment in 1979 and the face amount of a $16,000 "recourse" note which he gave as part of the second installment in 1980.[15]

In our judgment, the evidence overwhelmingly establishes that the so-called exclusive territorial franchise involved herein is a sham. We so find as a fact. Accordingly, we hold that petitioner is not entitled to the deductions claimed by him in respect of that exclusive territorial franchise. The mere fact

---

[14]SEC. 1253. TRANSFERS OF FRANCHISES, TRADEMARKS, AND TRADE NAMES.

(a) GENERAL RULE.—A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name.

(b) DEFINITIONS.—For purposes of this section—

(1) FRANCHISE.—The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.

*     *     *     *     *     *     *

(d) TREATMENT OF PAYMENTS BY TRANSFEREE—

(1) CONTINGENT PAYMENTS.— * * *

(2) OTHER PAYMENTS.—If a transfer of a franchise, trademark, or trade name is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction—

*     *     *     *     *     *     *

(B) in the case of a payment which is one of a series of approximately equal payments made in discharge of such principal sum, which are payable over—

(i) the period of the transfer agreement, or

(ii) a period of more than 10 taxable years, whether ending before or after the end of the period of the transfer agreement,

in the taxable year in which the payment is made * * *

[15]In addition, he gave a $16,000 nonrecourse note to complete the $32,000 installment for 1980. Also related to the franchise is a claimed deduction in 1980 for two items of interest aggregating $2,620 accrued in 1980 in respect of (a) petitioner's $32,000 installment note for 1979 and (b) a $7,000 note given by him as part of a purported obligation to purchase gemstones in 1979.

that he may have engaged in random profit-oriented jewelry transactions through Gem-Mart or otherwise in areas wholly outside of his exclusive territory cannot impart bona fides to his "exclusive territorial" franchise allegedly purchased by him. Those transactions were employed in part to give color to petitioner's claim to disproportionately large deductions based upon his alleged obligations relating to his purchase of the exclusive territorial franchise. To be sure, petitioner is entitled to deduct any ordinary and necessary expenses associated with such random sales under section 212 of the Code, and the Government has conceded on brief the allowance of such deductions. But those transactions—to be discussed more fully hereinafter—can hardly justify the allowance of the large deductions of amounts allegedly paid (through notes or interest accrued thereon) in respect of a spurious exclusive territorial franchise itself.

The record is replete with details leading to our finding that petitioner's exclusive territorial franchise is a sham. It would perhaps serve no useful purpose to enter into a comprehensive discussion of every such detail, but we will now proceed to comment on some of them that we regard as particularly noteworthy.

*The sham character of the exclusive territorial franchise.*— At the outset, it is important to understand that the very foundation for the entire territorial franchise or distributorship program rested on quicksand. At the base of that program were two newly created entities, American Gold and U.S. Distributor. Neither had any established goodwill or indeed, so far as this record reveals, even any assets of consequence. Although Davis had access to precious gems in substantial amounts, American Gold, itself, had no inventory or product or source of product apart from what Davis might voluntarily make available to it. Yet American Gold purported to grant to U.S. Distributor an exclusive "right" for 50 years to distribute American Gold's "product" worldwide. But, as just noted, American Gold had no "product" other than that which Davis might choose to make available to it, and he was under no contractual or other legal obligation to sell or turn over any "product" to American Gold. Thus, the entire structure could collapse if Davis should decide to direct the flow of the inventory to some other entity controlled by him, or to make

some other use of such inventory, or if he should decide to abandon the gemstone and jewelry business, or if he should become incapacitated by accident or illness, or upon his death. And the "right" which American Gold granted to U.S. Distributor was to extend over a period of 50 years—a "right" that was so defeasible and so illusory. The record shows that U.S. Distributor paid absolutely nothing for this "right," and in our view, it wasn't worth much more.

Having paid nothing for the foregoing "right" to distribute American Gold's product worldwide, U.S. Distributor then proceeded to fragment this right into geographical segments and to "sell" such fragments as exclusive territorial distributorships to franchisees, each of whom would then theoretically undertake to promote the sale of American Gold's product within the exclusive specified territory allocated to him. The minimum price for such a franchise or distributorship was $240,000, an amount that increased sharply depending primarily upon the amount of "tax savings" that the purchaser wished to achieve. Petitioner chose to purchase one for $384,000. The goal of the program was to sell some 5,000 distributorships, although only about 1,000 were actually sold. Even at the minimum price of $240,000, the total amount thus sold was at least about $240 million—all for segments of a "right" which U.S. Distributor got for nothing and which was wholly illusory! In this connection, the territorial distributorship program is not unlike other so-called tax shelters which involve the resale of, for example, motion pictures, master recordings, or lithographic plates, at grossly inflated prices. See, e.g., *Flowers v. Commissioner*, 80 T.C. 914, 937 (1983); *Siegel v. Commissioner*, 78 T.C. 659, 685 (1982); *Brannen v. Commissioner*, 78 T.C. 471, 494, 498 (1982), affd. 772 F.2d 695 (11th Cir. 1984); *Reali v. Commissioner*, T.C. Memo. 1984–427, 48 T.C.M. 826, 53 P-H Memo T.C. par. 84,427. See also *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Estate of Baron v. Commissioner*, 83 T.C. 542, 554 (1984).

Bearing in mind that neither American Gold nor U.S. Distributor had any goodwill whatever in respect of any potential exploitation of that "right," one may well ask who in his right mind would undertake to buy a $240,000 or $384,000 franchise in these circumstances. In the case of petitioner,

whom we found to be knowledgeable and highly sophisticated, the answer surely cannot be found in the oft-repeated cynical observation attributed to P.T. Barnum that "There's a sucker born every minute." The explanation is that the entire program of exclusive territorial franchises was merely an elaborate scheme to avoid taxes, having no business purpose.

The inescapable conclusion is that the so-called exclusive territorial franchise involved herein is a sham, and that it is not the sort of thing that Congress ever intended to include within the meaning of "franchise" in section 1253, any more than it intended the virtually meaningless steps in *Gregory v. Helvering*, 293 U.S. 465, 469 (1935), to qualify as a corporate "reorganization" within the statutory provisions there under consideration. In the numerous attempts to support tax-avoidance devices, it has become increasingly fashionable to quote dicta in *Gregory* to the effect that a taxpayer has the legal right "to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits" (293 U.S. at 469). But the use of that dicta in cases like the present stands *Gregory* on its head, for the very holding in *Gregory* was to the contrary, where the Court concluded that what was done there, even though scrupulously in accord with the literal language of the statute, was mere artifice and not the thing that the statute intended. In this connection, compare *Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983), where the Seventh Circuit stated in commenting upon the principle that one may so arrange his affairs that his taxes may be as low as possible:

The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly.

The fact that petitioner did actually participate in some profit-oriented jewelry transactions wholly unrelated to his exclusive territory should not obscure the spurious nature of the franchise itself. Before commenting more fully on this aspect of the case, we will meanwhile now set forth some of the factors relating to petitioner's Territorial Distributorship Agreement, itself, and the conduct of the parties thereunder,

which give further confirmation to our findings as to the sham character of his exclusive territorial franchise.

Although petitioner purported to undertake to pay $384,000 for an exclusive territorial distributorship, his exclusive territory was nowhere identified in the agreement, either when signed by him on December 27, 1979, or when signed on behalf of the other parties thereto on February 29, 1980. The only place in the agreement where the territory was to be specified was Exhibit D. But Exhibit D was left entirely blank when the agreement was originally signed by petitioner in December 1979 and finally executed by all parties in February 1980. To be sure, petitioner had requested a territory including certain portions of Encino, California, and Bethesda, Maryland, and he had been told by a Mr. Knowles in December 1979 that such territory would be assigned to him if it had not been assigned to someone else. But such oral "assurance" by Mr. Knowles had no binding effect, and in fact no such assignment was made to petitioner on February 29, 1980, when the agreement was finally executed by all the parties.

It staggers the imagination to believe that any careful lawyer like petitioner would even consider obligating himself to purchase an exclusive territorial franchise for $384,000—an amount shown by the evidence to have been vastly in excess of any investment that he had ever theretofore made in his lifetime—when the location of the territory was not specified in the contract. Indeed, under the contract, he could have been assigned a territory in Alaska, in the Soviet Union, in Greece, Turkey, South Africa, Sri Lanka, or anywhere in the world. The location of the territory does not appear to have been of critical importance to petitioner, and the real explanation for this seemingly extraordinary situation is that this was no true, bona fide agreement to purchase an exclusive territorial franchise.

We note that a completed Exhibit D was received by petitioner in August 1980, but even this Exhibit D was superseded by another Exhibit D in October 1980, specifying different areas identified by different zip code numbers in both Encino and Bethesda. It was explained to him that some unidentified person named "Penni" had been assigning territories incorrectly. Again, this is but further evidence that the

parties were not taking the agreement seriously, and gives added weight to our finding of sham.

Another fact that we cannot ignore is that, up to the time of trial herein (July 1984), petitioner never made any sales whatever, or attempted to make any sales, or even explored the possibility of making any sales in his exclusive territory— either in person, or through Gem-Mart or any other agent. He explained his failure to make any effort on the ground that beginning sometime in 1980 there was a sharp decline in selling prices of investment-grade diamonds, that the diamond market was in disarray, and that he was waiting for it to stabilize. We found that explanation wholly unconvincing and incredible.

True, the evidence did establish that there had been a very steep and uncontrolled rise in the sales prices of investment-grade diamonds for a period up to some point in 1980, when there was a turnaround in prices for such stones. However, we regard the evidence in respect of the diamond market merely as a smokescreen, calculated to mislead the IRS and this Court. Investment-grade diamonds represented only a part of American Gold's purported "product," and, as indicated by the minimum product requirement of the agreement, the real focus was not upon investment-grade diamonds but upon the high-profit imported colored gems, products C and D. Petitioner could readily have undertaken (either alone or through an agent) to do something about making sales or at least exploring the possibility of making sales of colored gems or other product in his exclusive territory. Plainly, he was not limited to selling investment-grade diamonds, and the record shows that there was market activity even in sales of diamonds, generally. Indeed, in December 1980, Gem-Mart sold some diamonds on petitioner's behalf in a random sale or sales wholly unrelated to his exclusive territory. We simply do not believe petitioner's explanation for his failure to make any effort whatever, even on an exploratory basis, to visit a single jewelry outlet in his territory. The real explanation is that he "bought" a tax-avoidance device, not a bona fide $384,000 exclusive territorial franchise.

Further evidence of the spurious character of the agreement is the conduct of the parties in respect of the contractual requirement that petitioner purchase "Minimum Product" for

cash. His obligation in this respect was to buy for cash minimum product in an amount equal to one-fourth of the face amount of any recourse note given by him as part of an installment payment of the purchase price of his franchise. Since he gave such notes in the amounts of $32,000, $16,000, and $16,000 for the years 1979, 1980, and 1981, respectively, he was contractually obligated to buy minimum product for cash in the amounts of $8,000, $4,000, and $4,000, for those years, respectively. Yet, he did no such thing, with the assent of, or at least without objection from, any of the parties concerned. He purchased $1,000 of minimum product (imported colored stones) in 1979, and nothing in 1980 or 1981. Instead, he gave notes (for which he did not receive any minimum product) in the amounts of $7,000, $4,000, and $4,000. These notes have not been paid. He has been explicitly relieved of liability on one of them, and, in our view of the evidence, he neither regards himself as liable on the other two, nor will he ever make payment thereon.

In 1981, there was a "Modification" agreement which made substantial changes in petitioner's original agreement to purchase his $384,000 exclusive territorial franchise. The Modification Agreement was undated, and recited merely that it "has been executed no later than December 31, 1981," an extraordinary situation leaving up in the air the matter of just when the revised provisions became legally effective.[16] Notwithstanding some testimony indicating otherwise, we are satisfied on the record that there were no real negotiations between the parties as to the substance of the Modification Agreement. These new provisions were characterized by confusion, sloppy draftsmanship, and inaccuracies—hardly the sort of thing that a competent lawyer like petitioner would have been expected to enter into if it were indeed regarded seriously by the parties as fixing their respective rights and obligations.

One of the most amazing provisions in the modification agreement is a retroactive elimination of interest on installment notes given in payment of the principal sum ($384,000). Since the notes bore 6-percent simple interest and matured some 25 to 30 years later, the elimination of the interest

---

[16]The parties stipulated that "In approximately September 1981, petitioner executed" the Modification Agreement. There is no evidence whatever as to when it was executed by the other parties or as to the date when it became legally binding upon the parties.

reduced petitioner's purported ultimate aggregate liability by over 150 percent of the face amounts of the notes. Moreover, as we pointed out in our findings, *supra*, p. 90, the self-contradictory language in one of the notes identified as a nonrecourse note described the maker's liability as unlimited! Petitioner obviously paid little, if any, attention to the content of these notes when he signed them.

Of even greater significance in assessing the bona fides of the entire transaction is petitioner's indifference to obtaining possession of the old notes when executing new, substitute notes under the Modification Agreement. It is inconceivable to us that a knowledgeable and careful lawyer like petitioner would execute a new note without, at the same time, having the substituted note returned to him, particularly when he regarded them as being possibly negotiable. The record indicates that he did not even make any effort to recover possession of the old notes. The explanation in our judgment is that he did not take these notes seriously and that he did not think that he would ever be called upon to pay them. We heard his testimony that he intended to pay those notes ultimately, but we did not find that testimony credible. In the context of this entire record, we do not believe that petitioner in fact contemplates payment of the notes.[17] This circumstance gives added weight to our finding that his exclusive territorial franchise is a sham.

In reaching the foregoing conclusion as to the nature of petitioner's "exclusive territorial franchise," we hasten to

---

[17]Nor is our conclusion in this respect affected by the provisions of par. 16 of the agreement, *supra*, p. 80, requiring prepayments in the amount of 10 percent of the franchisee's cost for all product (other than minimum product) purchased from American Gold. In the first place, no product was purchased by petitioner for resale in his exclusive territory. Moreover, to the extent that Gem-Mart acquired any product on petitioner's behalf, which it sold in random transactions outside of petitioner's territory, it withheld from him a percentage of the profit on sale, not the larger amount based upon a percentage of cost as purportedly required by par. 16 of the agreement. Such withholdings appear to have been in comparatively small amounts. Further, the record is utterly silent as to whether the amounts of any such withholdings were ever recorded on the notes as having been paid to that extent. Since petitioner thought that the notes might be negotiable, it again raises the troubling question whether he seriously regarded them as an obligation, particularly in view of the fact that he made no effort to find out whether such "prepayments" had actually been entered on the notes. The entire subject of the so-called prepayments impresses us merely as a device for increasing to some extent the profits realized on behalf of the owners of American Gold and U.S. Distributor (both ultimately owned in identical proportion by the same persons) on the random sales of gems furnished to the program by Davis—in part as part of an attempt to give color to the purported bona fides of the exclusive territorial franchise.

point out that we were fully aware of, but not fooled by, petitioner's transparent attempts to clothe his distributorship in the garments of a genuine business enterprise. The adoption of the fictitious name "Euhedral Enterprises," the registration of that name with the Los Angeles authorities, the Los Angeles authorization of Euhedral to make retail and wholesale sales, the obtaining of a seller's permit from the California State Board of Equalization, the purchase of stationery and business cards bearing Euhedral's name, the opening of checking accounts in its name in California and North Dakota, the payment of minor amounts of business taxes to the City of Los Angeles during the years 1980–84, the filing of sales tax returns with the California Board of Equalization during 1981–83 (unaccompanied by any payment, since there were no California sales)—all these were merely parts of the disguise obviously intended to project the misleading image of a gemstone business being carried on by petitioner in his exclusive territory. Petitioner never conducted any gemstone or jewelry business, either alone or through Gem-Mart or any other agent, in his exclusive territory. The adoption of the name Euhedral Enterprises was nothing more than a meaningless gesture. There is not the slightest indication that there was any advertising in its name, or that there were any efforts whatever, by mail, word of mouth, or otherwise, to call attention to its very existence to any prospective purchaser of gems.

The record is replete with other evidence of lack of bona fides in petitioner's purported purchase of an exclusive territorial franchise for $384,000. We need not belabor the point further. The exclusive territorial franchise was a sham. Section 1253 was never intended to apply to any such situation. And the same considerations are equally applicable to any attempt to support the claimed deductions under section 162 to the extent that they relate to the so-called exclusive territorial franchise. Petitioner is therefore not entitled to any deduction for accrued distributor's fees or interest in respect of any note relating to the exclusive territorial franchise.

There is a further aspect to this case which, in any event, calls for the disallowance of the deduction claimed by petitioner for 1979. As is amply revealed by the record and set forth in

our findings, there was no binding contract whatever during 1979 giving petitioner any purported franchise. The earliest date on which any contract was executed by the parties was February 29, 1980, and even on that date no exclusive territory was then assigned to petitioner.

*The jewelry transactions conducted or arranged by Gem-Mart.*—Although it is true that petitioner invested certain funds to enable Gem-Mart to execute some jewelry transactions, either directly on petitioner's behalf or through a joint venture, these transactions bore no relationship whatever to petitioner's so-called exclusive territorial franchise. Not a single sale was made—or even attempted to be made so far as this record discloses—in the exclusive territory[18] allegedly purchased by petitioner for $384,000. These sales had nothing whatever to do with petitioner's so-called exclusive territory. Yet the principal deductions at issue herein are amounts euphemistically described as "distributorship fees," purportedly paid or incurred by petitioner to acquire his exclusive territorial franchise.

To be sure, the sales made by Gem-Mart either directly or through Philip Michaels in Denver, Colorado, can fairly be treated as transactions entered into for profit. And the Government now concedes that petitioner is entitled under section 212 to all the ordinary and necessary expenses incurred in connection with these sales. But the spurious "distributorship fees" do not qualify as such ordinary and necessary expenses. Such "fees" were in no sense proximately related to these sales. The "fees" were theoretically incurred to obtain an exclusive territorial franchise, and these sales were not made in any way in connection with any such exclusive territorial franchise. Such sales were obviously calculated in part to create the misleading impression that petitioner had made a bona fide purchase of an exclusive territorial franchise and was actually making sales pursuant to the authority granted to him under that franchise. No such latter conclusion could be further from the truth.

---

[18]We note also that par. 25(c) of the Territorial Distributorship Agreement, *supra*, pp. 80–81, recites that petitioner "intends to personally promote the PRODUCT *in the Territory* acquired or cause promotion to be effected *within the Territory*" (emphasis supplied). The evidence establishes that there was no compliance herein with this provision.

Nor is there any persuasive force to petitioner's desperate effort to breathe vitality into his position by the suggestion that the sales made outside his territory were made "on an exclusive basis, together with other distributors," which should therefore qualify for treatment under section 1253. He contends that more than one person can join in the acquisition of an exclusive right to distribute a product. This is an unassailable truism, but that is not what occurred here. Petitioner did not join with anyone in "acquiring" his "exclusive territorial franchise," nor did he join with anyone else in acquiring exclusive rights to distribute American Gold's product in the territory of such other person. It is sheer nonsense to assert that sales made by the joint venture were made in any exclusive territory acquired by petitioner.[19] These sales were nothing more than transactions entered into by petitioner for profit—whether regarded as casual transactions governed by section 212 or as a separate business governed by section 162—wholly unrelated to any exclusive territorial franchise allegedly purchased by him. He is entitled to no deduction under section 1253 or under section 162 in respect of any exclusive territorial distributorship fee or any item relating thereto. He is entitled under section 212—and possibly under section 162—to any ordinary and necessary expenses incurred in connection with such sales, but such expenses do not include any "distributorship fee" or any item relating thereto.

What we have said above is applicable in large part to the few sales made on petitioner's behalf in 1983 by the traveling salesman, Warren Johnson. These sales were made in Johnson's area of business activity, namely, North Dakota, Minnesota, and Wisconsin. They were wholly unrelated to any exclusive territorial franchise allegedly purchased by petitioner for zip code areas belatedly specified in Encino, California;

---

[19]Further, in this connection, the first sentence of par. 25(d) of the Territorial Distributorship Agreement provides that "as a TERRITORIAL DISTRIBUTOR, [petitioner] will not be entitled to participate with other TERRITORIAL DISTRIBUTORS with reference to expenses, profits, or otherwise." Moreover, the second sentence of that paragraph states that the territorial distributor's "profits, if any, earned as a TERRITORIAL DISTRIBUTOR will depend solely on his own management and marketing ability, and not that of the DISTRIBUTOR or the IMPORTER or any affiliate." Yet Gem-Mart was wholly owned by American Gold (the "Importer"), and petitioner's contract with Gem-Mart, pursuant to which Gem-Mart conducted or arranged to conduct all of the sales in 1980, 1981, and 1982, on petitioner's behalf, was entered into on Feb. 29, 1980, the very same day that the Territorial Distributorship Agreement was entered into by all the parties thereto.

Bethesda, Maryland; and Galway and Waterford, Ireland. Such sales in no way support petitioner's claim to deductions for his exclusive territorial "distributorship fees" and related items.

*Burden of proof and other issues.*—At the start of the trial, petitioner filed a "Motion to Shift Burden of Proof to Respondent Re the Issue of Whether Petitioner Engaged in the Activity at Issue Herein for Profit." Since petitioner's counsel assured the Court that a ruling on the motion would not affect his conduct of the case, and since he recognized that the sham issue raised by the Government "probably covers the profit motive material also," the Court decided not to rule on the motion at that time. The motion was based upon section 183 of the Code, pertinent provisions of which are set forth in the margin.[20] Petitioner relies upon the alleged fact that he

---

[20]SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

(d) PRESUMPTION.—If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.

(e) SPECIAL RULE.—

(1) IN GENERAL.—A determination as to whether the presumption provided by subsection (d) applies with respect to any activity shall, if the taxpayer so elects, not be made before the close of the fourth taxable year (sixth taxable year, in the case of an activity described in the last sentence of such subsection) following the taxable year in which the taxpayer first engages in the activity. For purposes of the preceding sentence, a taxpayer shall be treated as not having engaged in any activity during any taxable year beginning before January 1, 1970.

(2) INITIAL PERIOD.—If the taxpayer makes an election under paragraph (1), the presumption provided by subsection (d) shall apply to each taxable year in the 5-taxable year (or 7-taxable year) period beginning with the taxable year in which the taxpayer first engages in the activity, if the gross income derived from the activity for 2 or more of the taxable years in such period exceeds the deductions attributable to the activity (determined without regard to whether or not the activity is engaged in for profit).

reported a profit in 2 of 5 consecutive years as required by section 183(d) and the fact that he timely filed an election under section 183(e). Petitioner's position is explained in his motion as follows:

Internal Revenue Code Section 183(d) provides that should the taxpayer so elect, respondent may not make a determination as to whether the presumption applies. Petitioner properly made the election. Since the determination in the Statutory Notice of Deficiency was premature, it should have been raised only by way of respondent's Answer. In this regard, Rule 142(a) of the Rules of Practice and Procedure of the United States Tax Court states, in relevant part, "The burden of proof shall be upon the petitioner, * * * except that in any new matter * * * pleaded in his answer, it shall be upon respondent * * *."

We reject that contention. It is faulty for a number of reasons, but we need articulate only several of them. In the first place, regardless of who bore the burden of proof, a full record was made herein, and our conclusion as to the sham character of the exclusive territorial franchise is amply supported by the evidence even if the burden of proof was upon respondent.

In the second place, petitioner's position is based upon the slippery assumption that his concededly bona fide casual jewelry transactions may be blended together with a phony exclusive territorial franchise so as to create the illusion of a single "activity" within section 183, in order to support the deduction of a spurious "distributorship fee" by reson of profits earned in two years from the casual jewelry transactions. But, as we have found above, these two "activities" may not be synthesized. In fact, petitioner carried on no "activity" whatever in respect of his purportedly exclusive territorial franchise.[21] The casual sales bore no valid relationship whatever to the so-called exclusive territorial franchise, and there was no profit whatever in any of the 5 years in respect of the "activity" of functioning as *a territorial distributor*.

Before petitioner may successfully invoke the provisions of section 183(d) and (e), the burden is upon him to show that he qualifies thereunder, i.e., that the conditions specified for the

---

[21]We note that in connection with the "at risk" provisions of sec. 465, there may be instances where some activities may be "aggregated." Sec. 465(c)(3)(B) and (C). But even under those provisions, petitioner's inactive "activity" of being an exclusive territorial distributor could not be aggregated with his wholly separate "activity" involving random sales of jewelry elsewhere.

application of these provisions have been met. As with any presumption, the party relying upon it must establish the basic facts giving rise to it. Fed. R. Evid. 301 advisory committee note.[22] See also S. Rept. 93–277, at 9 (1974); H. Rept. 93–1597, at 5–6 (1974). In this connection, petitioner has totally failed. He has not shown that there was an "activity" over a 5-year period in which the alleged exclusive territorial franchise was an integral part, and in which he derived a profit in 2 of the 5 years. To the contrary, the record is abundantly clear in revealing that whatever jewelry transac-  . tions may have been conducted on petitioner's behalf, none of them could properly be blended with the exclusive territorial franchise so as to represent a single "activity" in which the distributor's fees are a legitimate charge against the profits of the jewelry sales. The same considerations that we dealt with earlier in this opinion in support of our finding that the so-called exclusive territorial franchise was a sham are equally pertinent here.

A further impediment may well exist in respect of petitioner's position. The statutory provisions involve not a burden of proof, but merely a *presumption*. Once established, a presumption requires only that the party against whom it is directed go forward with evidence to rebut or meet the presumption. The "risk of nonpersuasion"—i.e., the burden of proof—remains throughout the trial on the party on whom it was originally cast. Fed. R. Evid. 301. See *Rockwell v. Commissioner*, 512 F.2d 882, 885 (9th Cir. 1975). But see *Faulconer v. Commissioner*, 748 F.2d 890 (4th Cir. 1984), reversing a memorandum opinion of this Court. However, we need not pass upon this point.

Moreover, in view of the conclusion that we have reached, we need not dwell on still further considerations that arguably support the Government's position—e.g., that even the modest "profits" reported by petitioner for the two years 1982 and 1983 would vanish if the nonrecourse notes in those years were taken into account; that in view of the possibility of distortion of income by manipulative use of recourse or nonrecourse notes to produce either profit or loss under the accrual system,

---

[22]Trials before this Court are conducted in accordance with the Federal Rules of Evidence, 28 U.S.C. app., the rules of evidence applicable in trials without jury in the U.S. District Court for the District of Columbia. Sec. 7453, I.R.C. 1954; Rule 143(a), Tax Court Rules of Practice and Procedure; Fed. R. Evid. 101.

the Commissioner was justified in requiring petitioner to report his transactions on the cash basis rather than on the accrual basis in order to clearly reflect his income, thereby resulting in the disallowance of the deduction for the distributor's fees reflected in the unpaid "recourse" notes given in 1979 and 1980, the years before the Court; or that regardless of petitioner's system of accounting, section 1253(d)(2)(B) requires actual "payment" in discharge of the principal sum over a period of 10 or more years and that petitioner's recourse notes "are merely promises to pay, rather than payments." Cf. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569 (1977).

It is not necessary to pursue the matter any further. The claimed deductions now in controversy were plainly not allowable.

*Decision will be entered for the respondent.*