ALBERT S. AND MARIAN C. PITTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pitts v. Commissioner
Docket Nos. 20535-85, 1146-88, 1223-88
United States Tax Court
T.C. Memo 1992-13; 1992 Tax Ct. Memo LEXIS 11; 63 T.C.M. (CCH) 1742; T.C.M. (RIA) 92013; January 7, 1992, Filed *11 Decision will be entered under Rule 155. James F. Moore, for petitioners. Russell K. Stewart and Michael D. Baker, for respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes for 1978 through 1985, increased interest, and additions to tax as follows: Increased Interest and Additions to Tax, Secs. [1]
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
6653(b)
6653(b)(1)
1978
$ 26,618
--
$   --
--
$   -- $    -- 1979
112,603
--
--
--
-- -- 1980
98,355
--
--
--
-- -- 1981
15,116
--
--
--
7,558
-- 1982
28,558
--
--
--
-- 14,279
1983
8,656
*
433 **
-- -- 1984
42,025
*
2,101 **
-- -- 1985
93,383
*
4,669 **
-- -- Year
6653(b)(2)
6659
6661
1978
$   -- $   -- $   -- 1979
-- -- -- 1980
-- -- -- 1981
-- -- -- 1982
3,112
3,003
2,737
1983
-- 2,597
-- 1984
-- 7,846
3,986
1985
-- 2,049
21,638
*12 After settlement of some issues, the primary issue for decision is whether certain fees were incurred in a trade or business and deductible under section 162 and section 1253(d)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife and resided in Media, Pennsylvania, when they filed their petitions in this case. References to petitioner in the singular are to Albert S. Pitts. Since 1958, petitioner has bought, sold, and promoted tax shelters, including those referred to generally as Jackie Fine Arts, Cal-Am Gem Sales, IME Gold, and Vancon Films, which tax shelters this Court has determined to be sham transactions lacking in economic substance. See Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989); *13 Moore v. Commissioner, 85 T.C. 72 (1985); Saviano v. Commissioner, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985); Brawner v. Commissioner, T.C. Memo. 1987-581. Beginning in 1982, petitioner also promoted a tax shelter investment program involving territorial distributorships for the sale of laser disc equipment and related technology under the auspices of American Technology Resources (ATR), a Nevada corporation. The stated objective of this tax shelter program was to sell to investors distribution rights for ATR products with respect to particular geographic territories and to have the investors sell, lease, and license ATR's laser disc products within these territories. In 1983, petitioner became president of ATR, and petitioner and his sons acquired substantially all of the stock of ATR. Neither petitioner, ATR, nor any of the other individuals associated with ATR had any experience relating to laser disc equipment or technology. Petitioner never attempted to determine whether ATR distributorships would be profitable. ATR had no manufacturing capability with respect to laser disc technology, *14 and ATR never held any patents. ATR's stated business plan was to enter into informal, oral agreements with manufacturers such as Sony Corp. of America and Panasonic Co. to acquire laser disc equipment for resale. These nonexclusive, oral agreements did not give ATR distributors any price advantage over other individuals and companies selling similar laser disc equipment. Under the agreements between ATR and its distributors, ATR distributors purportedly had the exclusive right to market, sell, lease, and license video discs and other laser disc equipment, technology, and services available to them through ATR within specified geographic territories until the year 2025, the expiration date of all ATR distributorship agreements. In return for rights received under ATR distributorship agreements, distributors nominally were liable, on a nonrecourse basis, for a one-time franchise fee. The total stated franchise fee due with respect to each distributorship was an arbitrary calculation that multiplied the total population of each territorial distributorship by 10 cents and by multiplying the resulting product by the number of years of the agreement. Petitioner did not consult with *15 experts regarding the formula for calculating the franchise fees. Under ATR distributorship agreements, the distributors' liability to ATR for the total franchise fee determined with respect to each distributorship, as calculated above, was stated to accrue over the course of 30 years, as follows: Year 1
20 percent of the total fee;
Year 2
20 percent of the total fee;
Year 3
20 percent of the total fee;
Years 4 through 10
No accruals;
Years 11 through 30
2 percent of the total fee.
The portions of the total franchise fee stated to accrue pursuant to the above schedule in years 1 through 3 and in years 11 through 30, however, were not due to be paid in the respective year of the purported accrual thereof. Rather, portions of the franchise fee accrued under the above schedule were due to be paid, without interest, at the earlier of 20 years from the year of purported accrual or in the year 2025. Also, the accrual of the portion of the total franchise fee that was scheduled to accrue in years 1 through 3 and in years 11 through 30 with respect to each distributorship would be triggered when and if each distributor was active as an ATR distributor in each of the respective *16 years. Although, as stated, the liability of ATR distributors for the franchise fees was not stated to be a recourse liability on which they were personally liable, the distributors could "elect" to be personally liable for all or part of the franchise fees as and to the extent portions of the total franchise fees accrued in years 1 through 3 and in years 11 through 30 of the investment. The promotional materials encouraged distributors to elect personal liability for the franchise fees in order to claim, for income tax purposes, ordinary deductions for the accrued portion of the franchise fees. ATR sold laser disc equipment to its distributors at ATR's cost plus 10 percent (cost of goods). The distributors' cost of goods was payable to ATR solely from the distributors' receipts from sales, leases, and licenses of ATR-related products and services. Distributors also were obligated, apparently quarterly, to pay to ATR a further markup over and above the cost of goods, equivalent to a certain percentage of their quarterly total cost of goods. The amount of this markup varied depending on whether distributors elected to be personally liable for accrued portions of the franchise *17 fees. If distributors did not elect to be personally liable, the markup was 20 percent of the distributors' quarterly total cost of goods. If distributors did elect to be personally liable for the accrued portions of the franchise fees, the markup was 10 percent of the distributors' quarterly total cost of goods. Also, amounts paid as markups on the distributors' cost of goods sold were to be applied as a credit against the franchise fees due from the investors. Under the distributorship agreements, each year for the first 3 years of the agreements, distributors also were stated to be liable to pay to American Technology Resources Financial, Inc. (ATR Financial), a wholly owned subsidiary of ATR, amounts designated as "guaranteed performance deposits" equal to 5 percent of the total franchise fees calculated for their respective territorial distributorships (a total guaranteed performance deposit to be paid over 3 years equal to 15 percent of the total franchise fee). Guaranteed performance deposits were to be paid in cash, and ATR Financial was to later transfer the deposits received to ATR. The stated purpose of the guaranteed performance deposits was to secure the distributors' *18 performance under the distributorship agreements. Under the distributorship agreement, ATR was authorized to use the guaranteed performance deposits to pay for its day-to-day expenses. Guaranteed performance deposits were not credited against the franchise fees due from distributors. At the end of 10 years, amounts received by ATR as guaranteed performance deposits that had not been spent by ATR were to be applied as credits against the distributors' cost of purchasing from ATR laser disc equipment. ATR's promotional materials given to prospective distributors did not contain projections of future sales or profits and did not provide investors any meaningful business plan for ATR or for the distributorships. The promotional materials included a lengthy tax opinion discussing the purported tax benefits of purchasing ATR distributorships. The promotional materials stated that distributors who paid taxes at a marginal rate of 50 percent would obtain a 2-to-1 write off on their Federal income taxes by deducting the franchise fees accrued under the distributorship agreements. In 1982, in an apparent effort to qualify as nontaxable the franchise fees received by ATR from distributors, *19 the exclusive right to sell or to establish ATR distributorships was transferred by ATR to the United States Motion Picture Institute, Inc. (USMP Institute), an alleged tax-exempt organization. No specific consideration was received by ATR from USMP Institute in connection with the transfer to USMP Institute of the right to establish ATR distributorships. USMP Institute, however, in exchange for this transfer, purportedly agreed to lend to ATR 75 percent of certain franchise fees USMP Institute was to receive in subsequent years from ATR distributors. This purported loan agreement was not reflected by a written promissory note. Any funds actually transferred or "loaned" under this agreement by USMP Institute to ATR apparently would not accrue interest and would not be due to be repaid at any specified time. On March 1, 1984, USMP Institute, ATR, ATR Product, a sole proprietorship owned and operated by petitioner, and all of the ATR distributors executed a profit sharing and joint management agreement (joint management agreement). The joint management agreement provided that ATR Product would manage all ATR-related business affairs of the distributors. Under the joint management *20 agreement, proceeds from sales made within the distributors' territories would be paid to distributors only after the cost of goods was paid to ATR and after the distributors' markup obligations to ATR were paid. Any profits from sales made inside the distributors' territories would be allocated among all of the distributors on a pro rata basis, based on the total franchise fee relating to each territory. As compensation for its services under the joint management agreement, ATR Product was to receive a percentage of the results from gross sales of laser disc equipment and technology. During 1982 and 1983, 34 ATR distributorships were sold to 32 individual investors and to 2 limited partnerships (one of which was ATR Philadelphia). EDI, Inc. (EDI), a corporation owned and controlled by petitioner and his sons, was the general partner of both limited partnerships. In the latter part of 1982, petitioner purchased the ATR distributorship for Media, Pennsylvania. The stated total franchise fee with respect to petitioner's distributorship was $ 100,000. Petitioner "elected" to be personally liable with respect to the first three installments of the franchise fee relating to this *21 distributorship (namely, to the extent of $ 60,000). Petitioner did not pay any guaranteed performance deposits in connection with this distributorship. In 1982, petitioner also purchased 6 units in ATR Philadelphia, the limited partnership that acquired rights to the ATR distributorship for Philadelphia, Pennsylvania. The stated total franchise fee associated with ATR Philadelphia's distributorship was $ 6.6 million. Under the terms of the limited partnership subscription agreement, the limited partners were to pay $ 3,000 per limited partnership unit, to be reflected by a $ 1,000 cash downpayment and a $ 2,000 deferred payment obligation, due in two equal annual installments. Petitioner, however, apparently did not pay any money or other consideration for his 6 limited partnership units. ATR Philadelphia "elected" to be personally liable with respect to the first three installments due relating to this distributorship (namely, $ 3,960,000). Each partner was supposed to assume a proportionate share of this liability. It is unclear from the record whether petitioner assumed his proportionate share of ATR Philadelphia's liabilities. In 1982 and 1983, neither petitioner nor *22 ATR Philadelphia made any sales of ATR-related products, and they obviously had no profits. Total combined gross sales of ATR and of ATR Product for 1982 until the date of trial allegedly were $ 14 million. In 1984 and 1985, profits of ATR Product from all sales of ATR-related products were $ 12,737 and $ 70,406, respectively. Petitioners filed Federal income tax returns for 1982 through 1985 and reported thereon the following losses relating to petitioner's investments in his ATR distributorship and in ATR Philadelphia: Source of Income (Losses)
Year
Petitioner's Distributorship
ATR Philadelphia
1982
($ 20,000)
($ 24,000)
1983
($ 20,000)
($ 24,000)
1984
($ 20,000)
($ 23,906)
1985
$    256 $    328 The above losses for 1982 through 1985 relate solely to petitioner's and to ATR Philadelphia's accrual of ATR franchise fees associated with the purchase of the ATR distributorships in Media and Philadelphia, Pennsylvania (specifically, the 60 percent portion of the total franchise fees that "accrued" in the first 3 years of the term of the distributorships). On audit, respondent disallowed the above losses on the ground, among others, that neither petitioner *23 nor ATR Philadelphia's activities with respect to the ATR distributorships in 1982, 1983, and 1984 rose to the level of a trade or business. OPINION Generally, under sections 162 and 1253(d), [2] taxpayers may currently deduct amounts paid or accrued in connection with the purchase or operation of a franchise business if the payments are contingent on the use or productivity of the franchise. "To be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity * * *. * * * sporadic activity * * * does not qualify." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). *24 To satisfy the trade or business requirement of section 162(a), the expectation of making a profit need not be reasonable, but the taxpayer must have entered into the transaction with the objective of making a profit. Simon v. Commissioner, 830 F.2d 499, 500 (3d Cir. 1987), affg. T.C. Memo. 1986-156; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner, 72 T.C. 28, 33 (1979). In assessing whether a taxpayer acted with the requisite profit objective, courts look at a number of factors under the regulations of section 183. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); sec. 1.183-2(b), Income Tax Regs. While no one factor is determinative, greater weight is given to objective facts than to the taxpayer's mere statements of intent. Simon v. Commissioner, supra at 501; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); *25 Allen v. Commissioner, supra at 34; sec. 1.183-2(a), Income Tax Regs.
In the present case, respondent concedes the characterization of the franchise fees in issue as contingent payments under section 1253(d)(1). Respondent, however, contends that petitioners are not entitled to deduct the franchise fees because the franchise fees were not paid or incurred in carrying on a trade or business within the meaning of section 162. Respondent asserts that petitioners have not established sufficient business activity for purposes of section 162, and that petitioners have not established that petitioner acted with a profit objective when investing in the ATR distributorships. We agree with respondent. There is no credible evidence that either petitioner or ATR Philadelphia ever engaged in any trade or business with respect to the ATR distributorships. Petitioners did not introduce into evidence any records of sales made by petitioner or by ATR Philadelphia. The structure of the financing with respect to the ATR distributorships was bizarre, not at arm's length, and not businesslike. The amount, accrual, and payment terms relating to the ATR franchise fees, in *26 particular, appear to be geared solely to the tax deductions to be claimed with respect thereto. ATR itself may have been and may be a legitimate business entity with a profit objective. Petitioners note the alleged $ 14 million in sales that ATR has realized since 1982, and petitioners allege that ATR has sold laser disc technology to respondent's Internal Revenue Service and to the Central Intelligence Agency. The business of ATR, however, is not the entity under direct scrutiny herein. The issue is whether petitioner and ATR Philadelphia were engaged in a trade or business in connection with their ATR distributorships. The evidence does not establish that fact. Petitioner neither individually, nor on behalf of ATR Philadelphia, ever consulted with experts in the laser disc industry as to the economic feasibility of the distributorships. Petitioner did not consult with experts regarding the value of ATR distributorships. Instead, petitioner arbitrarily established a formula for calculating the ATR franchise fees. At trial, petitioner presented no records of sales relating to his distributorships, nor did he produce any other business records pertaining to the distributorships. *27 Nothing in the record indicates that petitioner's distributorship, ATR Philadelphia, or any of the other ATR distributorships generated or participated in generating any of the $ 14 million in gross sales reported by ATR Product and ATR. We reject petitioners' assertion that the $ 14 million in gross sales reported by ATR and by ATR Product should be imputed to the distributorships because of the complete lack of records supporting such an assertion. We find that neither petitioner nor ATR Philadelphia was engaged in a business and that neither had an actual profit objective with respect to the ATR distributorships. Petitioners, therefore, are not entitled to deduct the franchise fees under sections 162(a) and 1253(d)(1). Respondent makes numerous other arguments regarding the nondeductibility of the ATR franchise fees. In light of our conclusion that the franchise fees were not incurred in a trade or business and that they are therefore not deductible under sections 162 and 1253(d)(1), we need not address these other arguments. With respect to the increased interest and the additions to tax, respondent determined that petitioners are liable for increased interest under section *28 6621(c) and for the addition to tax under section 6659 for the years 1982 through 1985, both based on the alleged overvaluation of the ATR franchises. Our finding, however, that the accrued franchise fees are not deductible because of the failure to satisfy the trade or business requirement of sections 162 and 1253(d)(1) was not based on any alleged overvaluation. Gainer v. Commissioner, 893 F.2d 225, 226-229 (9th Cir. 1990), affg. T.C. Memo. 1988-416; Todd v. Commissioner, 862 F.2d 540, 541-545 (5th Cir. 1989), affg. 89 T.C. 912 (1988); Diamond v. Commissioner, 92 T.C. 423, 447 (1989), affd. 930 F.2d 372 (4th Cir. 1991); Soriano v. Commissioner, 90 T.C. 44, 61 (1988). Accordingly, the increased interest and the additions to tax under sections 6621(c) and 6659 are not sustained. Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2) for 1983, 1984, and 1985, and section 6661 for 1982, 1984, and 1985. Petitioners have the burden of proof to show that respondent erroneously determined these additions to *29 tax. Rule 142(a). Petitioners have not offered any evidence, nor made any convincing arguments regarding these additions to tax. We sustain respondent's determination of additions to tax under sections 6653(a)(1) and (2) and 6661. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 120 percent of the interest accruing after Dec. 31, 1984, on the portion of the underpayment attributable to a tax-motivated transaction. ** 50 percent of the interest due on the portion of the underpayment attributable to negligence.↩
2. Sec. 1253(d) provides as follows: Amounts paid or incurred during the taxable year on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be allowed as a deduction under section 162(a)↩ (relating to trade or business expenses).